GERTRUDE LAPIERRE, RESPONDENT, v. G. T. KINNEY, DOING BUSINESS AS KINNEY COAL COMPANY, APPELLANT.*—19 S. W. (2d) 306.

Kansas City Court of Appeals.   June 17, 1929.

*Bert S. Kimbrall* and *Walter W. Calvin* for appellant.

*W. W. McCanles* for respondent.

LEE, C.—This is an appeal from a judgment for damages for personal injuries sustained by plaintiff in a collision between the automobile in which she was a passenger and a coal truck driven by an agent of defendant, in Kansas City, Missouri, on the afternoon of November 2, 1925.

Tracy Avenue, in said city, is about twenty-eight to thirty feet in width between curbs. It is paved with brick and is much used for hauling. There is a gradual ascent in the grade of the street south from 24th Street, which grade is steepest from 25th to 27th Streets.

Defendant is in the retail coal business in said city, under the name Kinney Coal Company. At about 4:15 P. M. on the day in question a delivery truck owned by defendant, loaded with coal from his yards, having a gross weight, including coal and truck, of 14,000 pounds, was being driven by one William M. Ross, in the employ of defendant, southward on said street. When it reached a point thereon, a short distance south of 25th Street, on the west side of the center of the street, his truck collided somewhat "head-on" with a Ford touring car driven by plaintiff's husband. Plaintiff, who was sitting on the right side of the front seat with her eighteen months old baby on her lap, was thrown against the windshield, which at the same time was broken, and then fell out, retaining her child in her arms, and it was not injured. Her husband, who was thrown against the wheel, but not hurt, helped her up, and she walked into a house nearby on the west side of the street, where she washed her face and examined her injuries. She then came out of the house and entered a taxicab, which had been called; and after sitting in it for ten or fifteen minutes was driven home with her child, her husband remaining at the scene.

The case was first brought against both Kinney and his driver, Ross. At the close of all the evidence plaintiff dismissed as to defendant Ross.

There was a verdict and judgment in plaintiff's favor for $3,500, from which defendant appealed to this court.

The allegations of negligence in the petition were as follows:

"That on the 2nd day of November, 1925 . . . the defendant, William M. Ross, driving a coal truck for and on behalf of The G. T. Kinney Coal Company, carelessly and negligently caused, allowed and permitted said coal truck to collide with the automobile in which plaintiff was riding. . . .

"Plaintiff says that the defendants were guilty of carelessness and negligence in causing said collision in the following respects, to-wit:

"(a) In that the said William M. Ross was driving said coal truck in a southerly direction on the east side of Tracy Avenue, the same being the wrong side on which to drive said truck, and as result thereof said collision occurred, and the plaintiff injured as aforesaid.

"(b) In that the said William M. Ross, driver of said coal truck, as aforesaid, did not have the same under proper control, and as result thereof ran into and collided with the car in which plaintiff was riding, causing her injuries.

"(c) In that the said William M. Ross, driver of said coal truck, as aforesaid, did not keep a reasonably sufficient lookout for the car in which plaintiff was riding, and as result thereof said collision occurred and the plaintiff was injured.

"(d) In that, although said William M. Ross saw, or by the exercise of reasonable care and caution could or should have seen the plaintiff and the car in which she was riding in time to have stopped said truck or slackened the speed thereof, and thereby have prevented injuring the plaintiff, the plaintiff being in perilous and dangerous position at said time and oblivious of her danger and unable to extricate herself therefrom, but the said William M. Ross failed, neglected and refused so to do.

"Plaintiff says that the foregoing acts of negligence contributed separately and concurrently to cause the plaintiff's injuries."

Defendant's answer was a general denial, and a plea of contributory negligence.

Appellant's first assignment of error is the overruling of defendant's demurrer at the conclusion of plaintiff's evidence. It does not appear in the record that a demurrer was filed at the close of all the evidence. Defendant's motion for a new trial alleged as one ground therefor the overruling of such demurrer at the close of all the evidence, and defendant now claims that the omission to show its filing in the abstract of record was an oversight. However, defendant does not thereby lose his right to review of the whole evidence on the question of its sufficiency to sustain a verdict. In the case of Pullen v. Hart, 293 Mo. 61, 238 S. W. 437, Judge GRAVES, speaking for the court, said:

"The defendant did file a demurrer to the evidence at the close of plaintiff's case, and such being overruled he put in his own case. Can he now urge that the evidence as a whole shows no case made by plaintiffs? To this we unhesitatingly say, Yes. . . . In other words, in strict law actions, if the defendant demurs upon the close of plaintiff's case, and does not stand upon such demurrer, but puts in his own case, he only takes the chances of aiding plaintiff's facts, by his own facts. He does not thereby lose the right to insist, without further demurrer, that the whole evidence, introduced by both sides, fails to disclose a case for plaintiff."

Plaintiff's husband testified as follows:

"I was just driving down there at the ordinary rate of speed, which I usually use, and have been ever since I have been driving a car, and there was a coal truck coming up the street, and he was going as fast as I presume he could go, which was not very fast, because it was a loaded truck, he was trying to make the grade on account of being a hill, and I was driving along, never paying any more attention to him than I would any other car, and the first thing I know, when in a short distance in front of me, he swung over on my side, the right, and it was so sudden and such an unexpected thing for me, that I see he would hit me if I continued the way he was going, because we were very close together, and to save my family and myself, I turned to the left side and slowed up, and as I was about to stop, was almost stopped, I was on the left side right at that time, but not clear over to the curb, or within a couple of feet of the curb, the front part of my car—and he hit my right hand hub—that is, his front wheel run right into my right hand hub. . . . I called up the police department; they connected me with one of the outside stations, and said they would send a man right away. I asked the fellow to stay, and he never got down off the truck, as I remember. I waited around, and they didn't come, so I called the department again, and they said they was busy that day, and could not make a call unless some one was terribly injured; so I then called up the Kinney Coal Company."

Also, that after defendant's representative came:

"So I showed him, I wanted to show him the position of the truck, because it was so apparent in the street, you could see where he had made a great big circle around a little indentation, a low spot, in the street, which he could have gone through if he wanted to, but he didn't want to, and did not, and his truck was easily fully on the east side of the road when it was going around this place. . . .

"Q. Where was the rear end of this truck with respect to the center of the street? A. It was about two feet on the east side of the center of the street at that time.

"Q. Now, so the record will get the directions properly, Mr. LaPierre, in what direction was the struck facing? A It would be facing southwest.

"Q. The front end southwest—and the rear end? A. Northeast.

"Q. Northeast. What direction was your car facing? A. My car was facing northwest."

Plaintiff herself testified:

"When I noticed the truck, it was coming right towards us, and when I saw it was going to hit us, I closed my eyes, and the first thing I knew I hit the windshield, and was then down on the running board.

"Q. When the truck was coming towards you, before you closed your eyes, what side of the street was the truck on, if you recall? A. The truck was on the east side of the street.

"Q. In what direction was it running at that time? A. Coming straight toward us.

．　．　．　．　．　．

"Q. Can you show the jury here in some way, in the courtroom, about how close you were when you closed your eyes? A. It was closer than to that, to one of those poles (indicating a pillar in the courtroom).

"Q. One of these pillars? A. Yes, sir.

"Q. Where was your car, now, what side of the street was it when it was coming towards you and you closed your eyes? A. We were on the right hand side.

"Q. On the east side? A. East side of the street; and the truck came right towards us.

"Q. Then, you closed your eyes? A. Yes, sir.

．　．　．　．　．　．

"Q. You were holding your baby in your arms, on the right hand side of your husband? A. Yes, sir.

"Q. That would put you on the east side of Tracy Avenue, as you came down the street? A. Yes, sir.

"Q. Now, you say you first observed the truck, as I understand you, when it was about a distance from you as far as to that pillar (referring to pillar in the courtroom)? A. Yes, sir.

"Q. You are approximating the distance? A. I think that is about the distance.

"Q. You have no way of telling any more accurately than that? A. No, sir.

"Q. Tell the jury if you saw a man driving the truck as it approached you? A. All I noticed was—I didn't notice—I know there was a colored man driving it. . . . What I was doing was paying more attention to the baby.

"Q. Naturally, a mother would, but in other words, nothing unusual was occurring, and you saw a truck coming towards you, that is all there was? A. Yes, sir.

"Q. Nothing unusual was observed by you, further than that? A. No, sir.

"Q. The next thing, you saw these machines—the truck and the car—went together? A. Yes, sir.

"Q. Mrs. LaPierre, about that time you closed your eyes? A. Yes, sir.

"Q. It would be a natural instinct to close your eyes, and you did close them? A. Yes, sir.

"Q. Then, there was a crash, and you were thrown into the windshield? A. Yes, sir.

. . . . .

"Q. On the way out, while you were going to the cab, did you see the relative positions of the truck and the car? A. The truck was so far to the east side of the street, I don't think another car could have got by.

"Q. That is at that time, even after they had stopped? A. Yes.

. . . . .

"Q. What direction was the truck pointing in? A. The truck was pointing in a southwesterly direction.

"Q. The truck was pointing in a southwesterly direction? A. Yes.

"Q. Was the rear end of the truck farther east then than the front end of it? A. Yes, sir.

"Q. And what direction was your automobile pointed? A. It was pointed northwest, but it was not in to the curb.

. . . . .

"Q. You knew, as a matter of fact, the truck was setting on the west side of the street, don't you? A. It was not setting on the west side of the street.

"Q. Do you tell the jury the truck was setting diagonally across the street, and not parallel with the curb—is that what you want to tell the jury? A. The back end of the truck was on the east side of the street, and it was facing—

"Q. (Interrupting) In other words, you tell the jury it was setting diagonally across the street? A. Yes, sir.

"Q. And not parallel with the curb, but setting diagonally across the street? A. Yes, sir.

"Q. Then, granting that to be true, where was your Ford car? A. Our car was turned facing northwest.

"Q. And right in against the right wheel of the truck? A. Yes, sir.

"Q. Anyway, so your car was west of the truck? A. No.

"Q. Where was it, if not west of it? Was it east of it, then, if you like that better? (No answer)

"Q. Was your car around east of this truck? (No answer)."

Ross, defendant's driver, testified that he was driving, alone, on the right side of the street, at about eight or nine or ten miles an hour, in second-gear, headed directly south, "and I could not imagine why he was on that side, headed toward me. I had come almost to a complete stop when he had hit me;" that witness was something like five or six feet from the curb when he actually struck; that he first saw him (plaintiff's husband, driving Ford car) coming, about seventy-five or 100 feet away, driving about the middle of the street, maybe a little to the right of the center; that he was at a distance of

"oh, twenty-five or thirty feet, not so very far, when he swerved in front of me, in front. . . . He swerved over. It looked to me like his wheels was wobbling, and I thought maybe he lost control. I had come to almost a complete stop when he hit me;" that he (witness) was then about five or six feet out from the west curb; that "The gentleman that was driving the car, Ford car, his right wheel was locked between my left wheel—that would be the side I was driving on, and his left wheel, it was right between my chassis and the fender; that is the way we was locked.

"Q. Did they stay that way? A. Yes, until I got an order or orders to move it. . . . He struck in between my left front wheel, between my left front wheel and my right fender and the chassis.

. . . . . .

"Q. His right wheel came into your wheel on the side you were driving on? A. There you are. His right front wheel did—he was headed towards me.

"Q. You must have run right into each other headon? A. I was about to stop, and I wondered why—

"Q. (Interrupting) And he run head-on into you? A. Run head-on and fastened himself.

"Q. His car was just about directly in front of you? A. Pretty near, not over six inches or a foot difference in the hind end and the front end.

"Q. Say here is your truck coming here, coming towards the south? A. Yes, sir.

"Q. And here is his car, going towards the north, when you stopped you were just about facing each other, were you? A. No, before we stopped.

"Q. Before you stopped you were about facing each other? A. Yes, sir."

The first allegation of negligence was that Ross (the truck driver) was driving the truck "in a southerly direction on the east side of Tracy Avenue, the same being the wrong side on which to drive said truck, and as a result thereof the collision occurred." Plaintiff's evidence tended to show the existence of a depression in the pavement, "about ten by twelve feet in area, and about six or seven inches deep, just a low place," extending from a point about two feet from the west curb toward the middle of the street. Plaintiff's husband testified that as the cars approached he was driving his own car at about fifteen or twenty miles an hour; that Ross turned clear around this depression, to about four feet of the east curb, at which time he was about thirty or forty feet distant from witness. There was evidence *pro* and *con* as to the existence of this depression. There were a number of disinterested witnesses as to the relative position of the cars after the collision, and as to just how they were

interlocked; but were not definitely agreed in their descriptions, save that the truck was standing west of the center of the street; and some saying that it was headed practically due south.

Ross testified that there was not any depression in the street, or anything else, to cause him to turn out, and denied that he ever did turn out at all. Appellant points out that the only evidence in the record tending to show that the driver was ever on the wrong side of the street is that offered on behalf of plaintiff, and that it is coupled with its own explanation as having been caused by the necescity of doing so to avoid the hole in the street. From this appellant argues that the jury cannot find as a fact that the truck was driven over to the east side of the street without of necessity finding from the same testimony that the act was not negligent. There was other evidence, however, that some traffic on that street did go over the depression without turning; and the question of negligence was one for the jury. We hold that this contention cannot be sustained.

A more serious question, however, is as to whether the acts in evidence, taken most favorably for plaintiff, show grounds for recovery within the allegations of the petition. Let it be assumed as a fact that Ross did negligently turn and drive his truck to and along the east side of the street. Will the allegation and proof of that fact then sustain a verdict for plaintiff where the evidence shows that the collision directly resulted, not from such fact of going into the wrong side of the street, thus causing plaintiff's car to turn to a presumed place of safety on the west, but from the fact that Ross did then suddenly swerve back to the west, and did strike plaintiff in that new place of presumed safety? The point is material; for if Ross did in fact turn over to and travel on the east side of the street, as alleged, and if plaintiff swerved over to the west side to avoid him, then the negligence of Ross in being on the east side would not have caused the accident; and a finding based on the negligence of Ross in re-swerving back to the west is not based on the allegations of the petition.

Only three persons testified to having witnessed the incident, namely, plaintiff, her husband and defendant's driver, Ross. Their testimony has been hereinbefore set out, so far as it refers to the location of the collision.

The petition, in paragraph (a), alleges the truck-driver's negligence in driving on the east or wrong side of the street "and as a result thereof said collision occurred." The testimony of plaintiff's husband (her only other eye-witness) was to the effect that the collision occurred on the west side of the street, when his Ford car was within about two feet of the west curb, and the rear of the truck about two feet east of the center. This would indicate that the collision was immediately caused, not by the truckman traveling along or swerving into the east (or wrong) side of the street, as alleged

in the petition, but from his turning back to the west or correct side of the street. This was an altogether different act of negligence, if any, from that charged, if the allegation be construed as claiming that this collision was actually on the east side.

Plaintiff herself testifies that both the truck and her own car were on the east side of the street when she first discovered the truck, at which time she shut her eyes and that then there was a crash. She also testifies that after she came out of the house the truck was diagonally across the street, with the rear on the east side. She did not see the actual collision, nor does she state directly where it occurred. Her evidence, if believed by the jury, tended to support the allegation of paragraph (a) of the petition, as to Ross being on the east side of the street, but will not support a finding that the accident occurred there. It does tend to prove, however, that being on the east side caused the collision, as the primary cause of the situation out of which the accident occurred. Tracy Avenue is shown to be only twenty-eight to thirty feet in width. This does not leave much room for maneuvering of automobiles in motion. The truck was heavily loaded, moving up-hill, and its ability to rapidly shift its position was necessarily limited. If it moved to the wrong side of the street, and the accident occurred as a result of the confusion and uncertainty in the mind of an approaching car driver as to its ultimate adjustment of position, then we think it can be said that the accident was a "result thereof," that is, of being on the wrong side, even though the actual impact occurred when the front ends of the two cars were west of the center of the street. As hereinafter noted, there was no evidence in support of the allegations in clause (b). However, there was inferential evidence for the jury under clause (c) of the petition. There was also evidence under clause (d), if submitted under proper instruction. There was, in fact, no instruction given or offered on this latter allegation.

We hold, therefore, that the demurrer to the evidence was rightly overruled.

Appellant next assigns as error the giving of plaintiff's Instruction No. 1, as follows:

"The court instructs the jury that if you find and believe from the evidence that on the 2nd day of November, 1925, about the hour of 4:15 of said day, plaintiff was a passenger in a Ford touring car, being driven by plaintiff's husband in a northerly direction on Tracy Avenue in Kansas City, Missouri, between Twenty-fifth and Twenty-sixth Streets, and that, while so riding, as aforesaid, William M. Ross, while acting for the defendant Kinney driving a coal truck for and on behalf of G. T. Kinney in a southerly direction at the aforesaid time and place, (x) caused, allowed and permitted said coal truck to collide with the automobile in which plaintiff was riding, *and* if you further find and believe from the evidence that the said

William M. Ross while acting for defendant Kinney was at the time and place (a) driving said coal truck in a southerly direction on the east or wrong side of Tracy Avenue in said city, *and* that the said William M. Ross while acting for defendant Kinney at said time and place (b) did not have said coal truck under proper control, *and* that he (c) did not keep a reasonably sufficient lookout for the car in which plaintiff was riding, *and* that as a direct result thereof he ran said truck into and against the automobile in which the plaintiff was riding, *and* if you further find and believe from the evidence that in all the foregoing respects, the said William M. Ross was guilty of carelessness and negligence, as carelessness and negligence is elsewhere defined in these instructions, and if you further find and believe from the evidence that as a direct result of said negligence, if you find that the defendant was negligent, the plaintiff was injured, and if you further find and believe from the evidence that at the time the plaintiff was exercising reasonable and ordinary care for her own safety, then it will be your duty to find the issues in favor of the plaintiff and against the defendant.

It will be noted that this instruction requires the finding, in the conjunctive, of one act of general negligence, in a clause which we have lettered (x), and of three distinct acts of specific negligence, in clauses which (following similar clauses in the petition) we have lettered as (a), (b) and (c).

Appellant does not suggest that this instruction goes beyond the allegations of the petition; but urges that it is erroneous because some of the acts of negligence therein referred to, although alleged in the petition, are wholly unsupported by any evidence, and that it was harmful and prejudicial error to include them. In its premise, this objection is well founded. We have held that the evidence indirectly supported allegation (a) as a cause of the collision. There is not a word of evidence even purporting to indicate a lack of proper control by the truck-driver, as charged under clause (b). Indeed, plaintiff's evidence tends to show the contrary, in that the driver is charged by plaintiff's husband with having intentionally "made a great big circle around" the depression, "which he could have gone through if he wanted to, but he didn't want to, and did not." The truck and load, weighing 14,000 pounds, was traveling as plaintiff's husband testified, "as fast as I presume he could go, which was not very fast, because it was a loaded truck, he was trying to make the grade on account of being a hill."

A failure to take what it afterward appears would have been the safer action, in a given instance, is not evidence of inability to control, in the absence of any evidence of an unsuccessful effort made to control in the manner alleged to have been called for under the circumstances, or of the failure to have proper control appliances.

The fact of the collision, which might have been due to other causes or neglects, is not by itself evidence of lack of control.

The jury would be justified, however, in finding the negligence charged under clause (c), of failure to keep a proper lookout. Ross, the driver, testified that he first saw plaintiff's car in the center of the street about seventy-five or 100 feet away, while he (Ross) was on the right (west) side of the street, which he says he never left; and that witness then came to an almost complete stop. However, taking the evidence, as we must, most favorably in support of the verdict, the finding that the driver went on the wrong side of the street, and that either before he regained his proper location, or in the process of so regaining it, he collided with plaintiff, in broad daylight, with no evidence that he could not have controlled his car if he had seen the danger, justifies the inference that he did not keep a sufficient lookout at all times.

Respondent, however, while not admitting that the evidence does not justify inferences as to all the acts of negligence charged, nevertheless argues that proof of only one allegation, covered by a separate clause in the instruction, would sustain a verdict; and that if the instruction is wrong, still the error was in defendant's favor, in that (being in the conjunctive) is placed a greater burden on plaintiff than was necessary.

The flaw claimed to exist in this argument is that the "extra burden" created by this instruction is not in requiring plaintiff to furnish evidence of more facts than are properly required of him to sustain his case, but in requiring the jury to find more such facts, when there is no evidence to support such finding. It is contended that to say that such an instruction, given after the close of the evidence, places an additional burden on plaintiff, is a mere play on words. His proof is already in. Rather, that its effect is to authorize the jury to make an additional finding in plaintiff's favor, not based upon any evidence which plaintiff has been burdened with submitting; that it places a burden on defendant of having the jury, in arriving at their general verdict, assume as true certain acts of negligence, alleged but wholly unproven. [Waddingham v. Hulett, 92 Mo. 528, 5 S. W. 27.]

In support of his contention, that where several acts of negligence are pleaded in the petition or recited in the instruction in the conjunctive, then if there is evidence of any one of them it will support a general verdict, plaintiff cites numerous cases in the Supreme Court of this State and in the Courts of Appeals. Those in the Supreme Court are as follows: McKenzie v. Randolph (Mo.), 257 S. W. 126; McIntyre v. St. L. & S. F. R. R. Co., 286 Mo. 234, 227 S. W. 1047; Kendrick v. Ryus, 225 Mo. 150, 123 S. W. 937; Harrington v. Sedalia, 98 Mo. 583; Baker v. K. C.-Ft. S. & M. R. R. Co., 122 Mo. 533, 26 S. W. 20; Potterfield v. Terminal R. R. Ass'n (Mo.), 5

S. W. (2d) 447; Crone v. United Rwys. Co. (Mo. Sup.), 236 S. W. 654.

We are cited to the following cases in the Courts of Appeals, which all seem to be based on the above rulings of the Supreme Court: Gibler v. Q. O. & K. C. R. R. Co., 129 Mo. App. 93 (St. Louis); Jackson v. Southwest Missouri R. R. Co., 171 Mo. App. 430 (Springfield; Troutman v. East St. Louis Cotton Oil Co. (Mo. App., Springfield), 224 S. W. 1014; Houston v. American Car & Foundry Co. (Mo. App., St. Louis), 282 S. W. 171; Bauer v. Fahr (Mo. App., St. Louis), 282 S. W. 150.

The only case we find in which the Kansas City Court of Appeals has noted the point in issue is that of Chambers v. Hines, 208 Mo. App. 222, 233 S. W. 949, in which this court followed the rule laid down in the foregoing cases without discussion.

On the authority of the foregoing cases we hold that the giving of plaintiff's Instruction No. 1 was not error.

Appellant assigns as further error that the verdict is excessive; also that the court erred in giving plaintiff's Instruction No. 3, submitting as an element of damage the permanency of plaintiff's injuries, of which appellant urges that there was no evidence.

The evidence shows that besides her temporary bruises and the cut on the underside of her lip, which bled freely and required a suture, she lost two teeth at the time, and was obliged to have two more extracted, requiring the wearing of a bridge; that she is now nervous and excitable; that when she has trouble with the children her lip twitches and her face gets to quivering; that she has been very irritable and takes tonics for that. Her physician testified that when he was called he found her very weak from loss of blood, very nervous and anemic; that she was in bed about a week, and he saw her several times; that at the time of the trial "she is greatly improved, she was very anemic, it took her a long time to regain her strength back. More or less, she was left nervous from the shock;" that she would be more or less nervous in the future. The petition does not ask an award for medical services or any special expenses or losses, and there is no evidence of the amount of any such expenditures. We believe that the evidence does not justify a finding of any permanent awarded are excessive is well founded. It appeared at the time of injuries of a serious nature, and that the complaint that the damag·· the trial that her only permanent injuries were the loss of four teeth, the nervous condition being apparently from the shock and fright due to the collision. We find no other error in the case. Therefore, if respondent shall within ten days from this date file in this court her *remittitur* in the sum of one thousand dollars ($1,000) then the judgment shall stand affirmed for twenty-five hundred dollars ($2500). If such *remittitur* shall not be so filed within ten days.

then the judgment shall stand reversed and the cause remanded. *Barnett, C.,* concurs.

PER CURIAM:—The foregoing opinion of LEE, C., is approved and adopted as the opinion of the court. *Bland* and *Arnold, JJ.,* concur; *Trimble, P. J.,* absent.