Dora PITTS, Respondent,

v.

Arthur H. GARNER, Administrator of the Estate of Elmer Cooper Deceased, and Vernon Kenneth Pogue, Jr., by his guardian ad litem, Martha Pogue, Appellants,

and

Charlsie Ann. PITTS, by her next friend, Dora Pitts, Respondent,

v.

Arthur H. GARNER, Administrator of the Estate of Elmer Cooper, deceased, and Vernon Kenneth Pogue, Jr., by his guardian ad litem, Martha Pogue, Appellants.

Nos. 46599, 46600.

Supreme Court of Missouri, Division No. 2.

Feb. 9, 1959.

Motion for Rehearing or to Transfer to Court En Banc Denied March 9, 1959.

Bond, Bond & Buehner, Joplin, for appellant, Arthur H. Garner, Adm'r of Estate of Elmer Cooper, Dec'd.

John M. Rice, Neosho, A. L. Shortridge, Joplin, for appellant, Vernon Kenneth Pogue, Jr.

Roy Coyne, Max A. Patten, Joplin, for respondent.

STOCKARD, Commissioner.

Dora Pitts and her minor daughter, Charlsie Ann Pitts, by her next friend Dora Pitts, each filed suit for personal injuries against Arthur H. Garner, administrator of the estate of Elmer Cooper, deceased, and Vernon Kenneth Pogue, Jr., a minor, by his guardian ad litem, Martha Pogue. The two cases were consolidated for trial, and were tried before the Honorable Walter E. Bailey, Judge of the Circuit Court of Jasper County, all parties expressly waiving a jury. At the conclusion of the evidence the trial court took the two cases under advisement. The record then contains this entry: "Now at this day [August 23, 1957] this cause comes on for final determination with the Honorable John H. Flanigan, Jr., acting as special judge. The parties hereto having heretofore filed herein their stipulation wherein they stipulated and agreed that the said John H. Flanigan, Jr., hear and determine the issues in this cause from a transcript of the testimony heard before the Honorable Walter E. Bailey, Judge of Division Number One and the further arguments of counsel." The special judge then entered judgment in favor of Dora Pitts and against both defendants in the amount of $11,457.50, and also entered judgment in favor of Charlsie Ann Pitts and against

both defendants in the amount of $9,957.25. After motions for a new trial were timely filed and overruled defendants separately appealed. The cases have been consolidated for hearing in this court, although docketed separately, and there was only one transcript filed.

Vernon Pogue contends that he is not liable, and he also contends that if he is liable the amount of damages awarded to each plaintiff is excessive. Arthur H. Garner contends only that the amount of the damages in each case is "grossly excessive." However, on oral argument to this court counsel for Mr. Garner unequivocally stated that after taking the appeal and filing his brief in this court he has concluded that the amount of the damages awarded in each case is not excessive, and he urged affirmance of the judgments.

We note at this point that the selection by agreement of a special judge apparently was done pursuant to Section 478.053 RSMo 1949, V.A.M.S., which was repealed effective ninety days after May 31, 1957, following a recommendation to the Legislature by the executive council of the Judicial Conference of Missouri dated January 4, 1957, in which it was stated "that Section 6 and 15 of Article V of the Constitution [V.A. M.S.], which sections are self-enforcing, pre-empt the entire field covered by said section of the statute [including Section 478.-053], and therefore, by implication, repeal same." The judgments were entered by the special judge before the effective date of the repeal of Section 478.053, and if the selection of a special judge by agreement was improper it was because Section 478.053 was unconstitutional, a matter we shall not raise on our own motion. We mention this so that this opinion may not be subject to an interpretation that this court is of the opinion that the procedure which was at one time authorized by Section 478.053 still exists.

The automobile collision giving rise to these causes of action occurred on Thanksgiving Day, November 24, 1955, about 10:30 p. m. at the intersection of U. S. Highway 71 and what is known as River Road about two miles south of the city of Joplin. Highway 71 is a heavily traveled interstate highway. At the place of the collision it is straight and runs generally north and south and is paved with concrete twenty-two feet in width. The intersection is close to the bottom of a long downward grade on Highway 71. River Road runs approximately east and west, but its intersection with Highway 71 is not exactly, but is almost, at right angles. It is of "black-top" construction. On River Road, approximately sixty feet west of the west edge of the pavement of Highway 71, is a clearly visible stop sign directed to traffic approaching Highway 71. On the northwest corner of the intersection there is a high and steep rocky bluff. A portion of this bluff near the intersection has been cut away and leveled off, but the remaining part is several feet higher than the pavement of River Road.

Dora Pitts and her daughter Charlsie Ann were passengers in a 1951 Hudson automobile being driven eastward on River Road by Elmer Cooper. Dora Pitts was sitting on the right side of the front seat and Charlsie Ann was sitting between her mother and Mr. Cooper and she was asleep. Mr. Cooper intended to make a left turn onto Highway 71 and go to Joplin. Vernon Pogue was driving south on Highway 71. There were four people in his car. The collision occurred when Mr. Cooper drove his automobile onto Highway 71 directly into the path of the Pogue automobile. The front end of the Pogue automobile struck the left front fender and door of the Cooper automobile and the place of the collision was a little east of the middle of the intersection. Mr. Cooper was killed, and Dora Pitts and Charlsie Ann were seriously injured. The trial court entered a judgment in each suit against the administrator of Elmer Cooper, and there is no issue on these appeals as to the liability of Mr. Cooper's estate. The question for determination is whether under the facts and circumstances of this case Vernon Pogue was negligent in any respect charged in plaintiffs' petitions.

According to Dora Pitts, Mr. Cooper stopped on River Road before entering the intersection at a place where she could see "both ways" on the highway, but she could not state precisely where the automobile was stopped in reference to the stop sign or the west edge of the pavement of Highway 71. She saw the headlights of an automobile "way up the hill" on Highway 71 "far enough I knew he [Cooper] had time enough to get across to our lane." This would indicate that the automobile was stopped fairly close to the highway because, as subsequently indicated, the bluff would prevent her from seeing "way up the hill" if the automobile was as far back as the stop sign. Mrs. Pitts then turned to awaken Charlsie Ann to tell her that they were nearing home, and when she looked up again the Cooper car was moving, and she saw to the north on Highway 71 automobile headlights "scary close" and she yelled "wait." She was "sure" that the Cooper automobile "was on the highway" when she saw the Pogue automobile, but she qualified her testimony by saying "I wouldn't want to be positive about anything." She also stated that Mr. Cooper "must have stepped on the passing gear and it didn't have time to take hold."

Vernon Pogue testified that he and his three friends had been to a drive-in theater and were on the way home. After leaving the "county line" he drove about 45 miles an hour but his rate increased to 50 or possibly 55 miles an hour when going down the incline toward the intersection with River Road. He was familiar with the intersection and knew that there was a stop sign on River Road for traffic coming from the west toward the highway. As he approached the intersection there were no automobiles approaching from the south. When he was in the neighborhood of 200 feet north of the intersection he looked to his right, that is, to the west and he saw no automobile approaching on River Road. At that position he couldn't see farther back on River Road than the stop sign because of the intervening bluff. He then looked to his left (the River Road crossed the highway and proceeded on eastward) and when he looked back to the right, he saw two headlights of an automobile about even with the stop sign "coming fast enough I realized it couldn't stop." He was then 70 or 75 feet, also estimated to be 50 to 60 feet, "back up" the highway. He "automatically slammed" on his brakes and swerved to the left, but he struck the Cooper automobile. He did not sound the horn on his automobile because he did not have time and he was trying to stop or swerve. His automobile was equipped with hydraulic brakes, and the brakes and automobile were in good working order.

Highway patrolman Coble testified that north and west of the point of collision there were "no skid marks I could determine for sure," and that skid marks southeast of the point of collision were the "only skid marks I could swear came from those two vehicles."

Lieutenant Hill of the Joplin police force testified as an expert. He testified concerning photographs which were taken from various locations on Highway 71 with the camera facing southwest toward River Road. It was his opinion that at a point approximately 192 feet north of the intersection on Highway 71 a person could see an object on River Road 105 feet from the intersection; at 140 feet north on Highway 71, one could see 129 feet west on River Road; at 96 feet north on Highway 71, one could see 195 feet west on River Road; and and at 50 feet north on Highway 71, one could see 225 feet west on River Road. However, his testimony that one could see a stated distance was based on daylight conditions, and the accident occurred at 10:30 p. m. late in the month of November. In addition, he admitted that he was basing these figures on a line of sight over the intervening higher ground between the highway and the road, and that a driver's view from a moving vehicle would be different from a posed situation. Lieutenant Hill estimated the stopping distance of an automobile traveling 50 to 55 miles an hour to

be "no greater distance than 165 feet," but he stated that a down hill grade would result in "some" increase, and that an increased load by reason of passengers would "slightly" affect the stopping distance. This estimate of stopping distance did not include reaction time, and he estimated the stopping distance, with reaction time, at 55 miles an hour to be 230 feet. This was substantially the same as Vernon Pogue's estimate of "at least 200 feet" as the distance in which he could have stopped his automobile under the circumstances including reaction time.

In our review of this case, which was tried without a jury, we review the record de novo and determine the credibility, weight and value of the testimony and evidence, and we arrive at our own conclusions based on the entire record. Ordinarily in doing so we give due deference to the trial judge's opportunity to see and hear the witnesses and thereby judge their credibility. However, the special trial judge heard no testimony. He based his conclusions only on a reading of the transcript. Therefore, there is no occasion to give deference to what would appear, by reason of the judgments entered, to be his determination of any factual issue.

Plaintiffs, in their petitions, charged that Vernon Pogue was negligent in that (1) he "operated his automobile at a high, dangerous and excessive speed, to-wit: a speed of 50 miles per hour for a distance of more than one-half mile prior to the entering of the intersection;" (2) he failed "to keep a lookout for another vehicle approaching the intersection;" (3) he failed to have his automobile under such control that it "could be stopped, the course or direction thereof changed, or the speed thereof slackened upon the approach of another car into said intersection from the west;" (4) he operated his automobile with inadequate or insufficient brakes; (5) he failed to yield the right of way to the automobile on his right entering the intersection; (6) he operated his automobile on the left side of the road; and (7) humanitarian negligence in that in the exercise of the highest degree of care he saw, or could have seen the plaintiffs in a position of peril in time so that with the means at hand and with safety he could have slackened the speed of his automobile, swerved or stopped, or sounded the horn thereon and avoided the collision. The question for decision here is not, as in the usual automobile collision case, whether plaintiff made a submissible case, or whether a submission of negligence in an instruction is supported by the evidence, but it is whether under all the facts and circumstances as revealed by the evidence Vernon Pogue was negligent in any of the respects charged by the plaintiffs, and if so, whether that negligence contributed in whole or part to cause the injuries to plaintiffs. The issue of liability in this case is not to be confused with the issue of submissibility.

We shall consider first the charge in plaintiffs' petition that Vernon Pogue was guilty of humanitarian negligence. The evidence in this case establishes that the stopping distance of Vernon Pogue's automobile under the facts and circumstances was from 200 to 230 feet. Although, as subsequently mentioned, we seriously doubt that the Cooper automobile was stopped, plaintiffs' evidence is to the effect that Mr. Cooper did bring his automobile to a complete stop at some indefinite place before he drove onto the highway, and Dora Pitts testified that at that time she could see "way up the hill." Vernon testified that when he was approximately 200 feet north of the intersection he looked and could see as far as the stop sign, but that he saw no automobile. Assuming that the Cooper car was stopped as plaintiffs contend, and that Vernon looked and did see or should have seen the Cooper car, plaintiffs were not then in a position of imminent peril, and under the humanitarian doctrine there was then no duty on Vernon to do any of the things plaintiffs charge he negligently failed to do. Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73,

75; Banks v. Koogler, Mo.Sup., 291 S.W. 2d 883, 889. However, according to plaintiffs, Mr. Cooper started his car toward the highway when Dora Pitts could see the headlights of what proved to be Vernon's automobile, and it was not until then, or when it should have become apparent to Vernon in the exercise of the highest degree of care, that Mr. Cooper was going to drive his car onto the highway in front of him, that plaintiffs entered into a position of imminent peril. Banks v. Koogler, supra at page 889. The only evidence as to the location of Vernon's automobile at that time is the testimony of Dora Pitts that about the time the Cooper car reached the highway the Pogue automobile was "scary close," and the testimony of Vernon that when he was between 50 and 70 feet from the intersection the Cooper automobile was being driven toward the highway at a rate which he estimated to be about 30 miles an hour and that it was "shooting out in front" of him. In view of the evidence as to stopping distance, we conclude that Vernon could not then have stopped his automobile with the means at hand with safety to himself and passengers before the collision.

 Plaintiffs make no argument in support of their allegation that humanitarian negligence was established in that Vernon failed to sound his horn. In view of the testimony which indicates that this is a case where Mr. Cooper drove onto the highway in front of the Pogue automobile in an effort to "beat" it across the intersection, it is entirely speculative that the sounding of a horn would have given him any notice he did not have. In addition, Vernon testified that when he first saw the Cooper car he attempted to stop and swerve but did not sound his horn because he had no time to do so while attempting to stop and swerve. When a situation suddenly confronts a driver and he has time to stop, swerve or slacken speed, or attempt to do so, but does not have sufficient time to do these acts and also sound a horn, his election to attempt to stop or swerve or slacken his speed does not necessarily mean he was negligent in failing to sound his horn. Vietmeir v. Voss, Mo.Sup., 246 S.W.2d 785. Under the facts, we think Vernon made the proper election in this case, even though he was unsuccessful in avoiding the collision.

Plaintiffs argue and contend that Vernon could have "slowed his car sufficiently or altered the course thereof" and avoided the accident. From the argument in their brief it appears that they rely primarily on this contention in establishing negligence on the part of Vernon under the humanitarian doctrine, but it is obvious that they have erroneously assumed that if a submissible case was made on this theory they are for that reason entitled to judgment. Note the argument in their brief: "If, as argued by appellant Pogue, no submissible case was made against him on the primary negligence of failing to keep a vigilant lookout ahead and laterally (which is denied by respondents) surely there is ample evidence of a submissible case against Pogue under the Missouri Humanitarian Doctrine." They then cite Lilly v. Boswell, supra, which is the only case cited in support of their contention that they are entitled to judgment on the basis that Vernon was guilty of humanitarian negligence, and that case pertains to the question of whether a submissible case was made. Such cases, however, are not determinative in the situation where we are called upon to decide the issue of liability from all the evidence.

We as the fact finding agency in this case do not consider the testimony and evidence to be sufficiently convincing that Vernon was guilty of humanitarian negligence for failing to slacken the speed of his car or swerve or to do both. Plaintiffs offered no evidence as to the speed of the Cooper automobile as it approached or entered upon Highway 71. Vernon testified that it was traveling approximately 30 miles an hour. The physical facts show that this is not what has been referred to as an "almost escaping case,"

see Gann v. Chicago, R. I. & P. R. Co., 319 Mo. 214, 6 S.W.2d 39; Smith v. Thompson, 346 Mo. 502, 142 S.W.2d 70, and just a little swerving or slackening of speed, or both, would not have avoided the collision. Vernon did swerve his automobile to the left, and he and his front seat passenger both testified that he did apply his brakes in an attempt to stop and to slacken his speed. Under the split second timing in this case, the evidence does not, in our opinion, justify a conclusion on our part that Vernon was guilty of humanitarian negligence in failing to do more than he did when and after plaintiffs entered a position of imminent peril. There is nothing to support a conclusion that under the circumstances he effectively could have done more.

We turn now to a consideration of whether Vernon was guilty of primary negligence. As previously noted, plaintiffs charged Vernon in their pleadings with six acts of primary negligence. In the points of his brief, Vernon contends that the special judge erred in entering judgment against him because there was no evidence to support four of the charges of negligence. No mention whatever is there made of the charges of negligence that he had inadequate brakes and operated his car on the left side of the road, and plaintiffs make no mention of these omissions in their brief. We are of the opinion that there was no evidence to support either charge of negligence, and we shall treat the matter as though the parties by agreement concede that these charges of negligence in the petitions are not for consideration in this case.

■ The two charges of negligence pertaining to excessive speed and failure to keep his automobile under control may be considered together. There is no evidence which would justify a determination that Vernon did not have his automobile under control except that by reason of his speed he could not stop or slacken his speed or swerve sufficiently in order to avoid the collision.

■■ Vernon was traveling, immediately prior to the accident, at 50 or possibly 55 miles an hour in a rural area on a modern, well maintained, interstate highway of concrete construction. For some distance both north and south of the intersection with River Road the highway is perfectly straight, and it was free of other traffic. Vernon was familiar with the highway and he knew that the intersection he was approaching had a stop sign directed to traffic approaching the highway on River Road. He was not exceeding any statutory speed limit, and there is no showing that he was exceeding any posted limit as to a safe operating speed. His automobile was in good mechanical condition, including the headlights, and the automobile was equipped with hydraulic brakes and new tires. There is no evidence that he or any of his passengers had been drinking, or that he was tired or fatigued, or in any other way not capable or competent to operate his automobile. Whether a particular speed, not unlawful by reason of statute or ordinance, is excessive depends upon the condition of the highway and all the surrounding circumstances and conditions existing at the time. Chenoweth v. McBurney, 359 Mo. 890, 224 S.W.2d 114; Wood v. Claussen, Mo.Sup., 207 S.W.2d 802; Ritchie v. Burton, Mo.App., 292 S.W.2d 599. Also, the fact that a collision occurred which appears to have resulted from other causes, for example in this case the fact that Cooper drove his automobile directly into the path of Vernon's automobile, does not by itself establish negligence by reason of lack of control. La Pierre v. Kinney, 225 Mo.App. 199, 19 S.W.2d 306. Plaintiffs have cited to us no case in support of their position that under the circumstances revealed by the record Vernon was negligent by reason of excessive speed or failure to have his automobile under control. In fact, in their brief they do not present any argument directly in support of either contention. By reason of our review of the whole record, and after particularly taking into consideration the type and condition of the highway, the pres-

ence of a stop sign, Vernon's knowledge of the conditions, and the circumstance of Mr. Cooper driving his automobile onto the highway into the path of Vernon's automobile, we conclude that it has not been satisfactorily demonstrated that Vernon was negligent by reason of excessive speed or failure to control his automobile.

■ Vernon next contends that the evidence does not support a finding that he was negligent by reason of failing to maintain a lookout. Apparently plaintiffs rely principally on this charge of negligence because the only cases cited in their brief on the issue of primary negligence appear to be directed to this point.

Plaintiffs' position is that even though Cooper was faced with a stop sign, and that he unquestionably drove onto the highway directly in front of the approaching Pogue automobile, if Vernon had maintained a careful and vigilant lookout he would have seen that Cooper intended to enter the highway ahead of him. Plaintiffs argue that this is established by their evidence to the effect that when Vernon was 192 feet north of the intersection he could see 105 feet west on River Road. We do not doubt that if this case had been submitted to a jury that a submissible case was made on the question of the failure of Vernon to maintain a proper lookout, but as the trier of fact we are to determine whether under the circumstances Vernon was in fact negligent for this reason.

We feel impelled to comment that regardless of how far back on River Road Vernon could in fact see, it is plaintiffs' contention, based on the only evidence they offered, that the Cooper automobile was not back there approaching the highway, but that it was stopped someplace sufficiently close to the highway for Dora Pitts to be able to see "way up the hill." However, we are not favorably impressed with the testimony that the Cooper automobile came to a complete stop before entering the highway, and in their briefs plaintiffs are very careful to avoid an unequivocal stand in

accord with their only testimony on this issue. For example, the contention made in their brief is that if Vernon had looked when 192 feet from the intersection he "would have observed the Cooper car coming toward the intersection * * * or Pogue would have seen the Cooper car start forward from the stop sign * * *." This calls for the further comment that there was no evidence that Cooper was stopped at the stop sign. Apparently plaintiffs want to rely on the Cooper automobile being stopped back at that point, rather than closer to the highway where Dora Pitts' testimony indicates it would have been, in order to avoid the implication that if Cooper was in fact stopped he then started up and drove onto the highway when Vernon was so close that he could not avoid the collision.

Cooper either stopped before driving onto the highway or he did not, and as previously indicated we are of the opinion that he did not in fact stop but that he drove directly from River Road onto the highway and in front of Vernon's approaching automobile. In our opinion this is the less unreasonable explanation of this obviously unnecessary accident, and it appears to us to be consistent with the time sequence and factual circumstances of its ocurrence.

■ Vernon testified that when he was approximately 200 feet from the intersection he looked to his right toward River Road and could see at least as far back as the stop sign and there was no automobile there. He then looked to the left because there was also a road approaching the highway from that direction. " 'In the case of automobiles operating upon public streets and highways, the operator has imposed upon him the *continuous* statutory duty to exercise the highest degree of care at all times and all places thereon to keep a lookout for persons thereon and in every other respect.' " Faught v. Washam, 365 Mo. 1021, 291 S.W.2d 78, 82. But the continuous duty to maintain a lookout does not necessarily mean that the operator of an automobile must continuously look laterally ahead:

to the right after determining that no automobile was approaching the highway on the River Road from the west as far back as the stop sign, Vernon looked laterally ahead to the left because there was a road approaching the highway from that direction. An operator of an automobile on a public highway cannot assume that another automobile would not be present on the highway under circumstances that would be in violation of the rules of the road and for that reason not maintain the continuous lookout required of drivers, Faught v. Washam, supra, but after Vernon determined that no automobile was approaching the highway on River Road back as far as the stop sign he then, in the exercise of the highest degree of care and in compliance with his duty to maintain a constant lookout, could and should look laterally ahead to the left which ·he did in this case. A stop sign does not relieve a motorist of his duty to maintain a constant lookout ahead and laterally ahead, and a motorist cannot rely solely on the stop sign and drive blindly into the intersection, but a motorist on a through highway is entitled to assume, in the absence of any circumstance which would put a reasonable person in the exercise of the highest degree of care on notice that such assumption was unwarranted, that the driver of a nonemergency vehicle approaching a through highway on an intersecting highway will obey a clearly visible stop sign and stop before entering the through highway. Collier v. St. Louis Public Service Co., Mo.App., 298 S.W.2d 455; Hanks v. Anderson-Parks Inc., Mo. App., 143 S.W.2d 314; Lord v. Austin, Mo.App., 39 S.W.2d 575; Annotation 164 A.L.R. 64. As to the legal duty to stop, see Section 304.021, subd. 4, RSMo 1949, V.A. M.S. In compliance with his duty to maintain a constant lookout ahead and laterally ahead Vernon did look to the west and then to the east, and when he looked back to the west the second time he saw for the first time the Cooper automobile in the vicinity of the stop sign traveling toward the highway fast enough that he knew it was not going to stop. These speeds and distances

are consistent with Vernon's inability to see the approach of the Cooper car when he first looked, because of the intervening bluff, and they are consistent with the circumstances and with the manner and place the collision occurred.

Plaintiffs cite and rely on Collier v. St. Louis Public Service Co., Mo.App., 298 S.W.2d 455; Politte v. Miller, Mo.App., 301 S.W.2d 839; and Harrell v. Berberich, 359 Mo. 551, 222 S.W.2d 733. The last case pertains to humanitarian negligence and plaintiffs do no more than cite it. Under the facts of this case we think the first two cited cases support the conclusion we have reached that Vernon was not negligent in that he failed to maintain a careful lookout. Both of these cases pertained to city traffic conditions and automatic red and green traffic signals, but the general principles are applicable. In these cases it was held that "The duty of a motorist to exercise the highest degree of care and to maintain a careful and vigilant lookout ahead and laterally ahead when entering an intersection * * * is not relieved or excused by the fact that he is favored by a green light nor does that fact confer upon him an absolute right to proceed across the intersection regardless of the movement of other traffic," Politte v. Miller, supra [301 S.W.2d 842], but "A motorist favored with a green traffic signal has the right to assume that *non-emergency* vehicles approaching on the intersecting street will obey the red light and come to a stop, and to rely upon such assumption until and unless he knows or by the exercise of the highest degree of care should know that the cross traffic is not going to obey the red light but intends to proceed into and across the intersection without stopping." Collier v. St. Louis Public Service Co., supra [298 S.W.2d 455].

From our study of the entire record in this case we are of the opinion that the evidence does not satisfactorily establish that Vernon was negligent for the reason that he failed to maintain a vigilant lookout. His duty was to maintain that lookout

laterally ahead to the left as well as laterally ahead to the right; he looked to his right and saw no automobile on River Road as far back to the west as the stop sign; he was not then required under the circumstances in the exercise of the highest degree of care to look thereafter constantly in that one direction although he was required to maintain a constant lookout; and he was entitled to rely, within the limits previously stated, on automobiles approaching from farther back than the stop sign to obey its instruction to stop before entering upon the highway. Perhaps if Vernon had looked first to his left and then to his right, he might have seen the Cooper automobile a little earlier, but we are unwilling to say in this case that if a motorist has the duty to maintain a constant lookout laterally ahead in two different directions he is negligent because he first looked in one direction and then subsequent events indicate that possibly he could have seen an approaching automobile a little earlier if he had looked first in the other direction.

■ Vernon next contends that there was insufficient evidence to support a finding that he wrongfully or negligently failed to yield the right of way. We find no argument whatever in plaintiff's brief in support of this charge of negligence. Section 304.021, subd. 4, RSMo 1949, V.A.M.S., as amended by Laws of Missouri 1953, page 587, provides as follows: "The driver of any vehicle shall stop as required by this section at the entrance to a through highway and should yield the right of way to other vehicles which have entered the intersection on the through highway or which are approaching so closely on the through highway as to constitute an immediate hazard. The state highway commission may erect stop signs at the entrance of any public road into a through highway." Highway 71 is a through highway and the stop sign on River Road was erected by the State Highway Commission. Unquestionably, Vernon's automobile was approaching so closely on the through highway as to constitute an immediate hazard to the Cooper automobile. Vernon obviously did not negligently fail to yield the right of way.

■ We view this unfortunate accident as resulting solely from the fact that the Cooper automobile was negligently and wrongfully driven onto the through highway directly into the path of Vernon's automobile under circumstances in which Vernon could not in the exercise of the highest degree of care and with the means at hand and with safety to himself and his passengers have avoided the collision, and that the preponderance of the evidence establishes that under the circumstances and conditions then and there existing Vernon was not in fact negligent in any of the respects charged and here discussed. For this reason we conclude that the judgments against Vernon are clearly erroneous. To conclude otherwise would result in the requirement that every person who operates an automobile on a through highway in a rural area must operate it so that in every case he can in some manner avoid any automobile which is unlawfully and deliberately driven onto the highway from a side road directly and immediately in front of him. Of course, we agree and emphasize that merely because one is operating his automobile on a through highway and has the right of way he cannot proceed into an intersection without regard to other traffic, even if its movement or presence is in violation of law, and the fact that a motorist may have the legal right of way does not excuse him from exercising the highest degree of care and from maintaining constantly a careful and vigilant lookout. Most highway accidents, and certainly accidents of this type, do not happen except as the result of the negligence of one or both drivers, but based upon a careful study of all the circumstances revealed by the record we are of the opinion that the evidence does not satisfactorily establish that negligence on the part of Vernon was a contributing cause of this accident.

In view of the above result and the admissions made at oral argument by counsel for

**520**

Arthur H. Garner, administrator, we need not discuss the question of the excessiveness of the judgments.

The judgment in each case is reversed as to Vernon Kenneth Pogue, Jr., and as to Arthur H. Garner, administrator of the estate of Elmer Cooper, deceased, the judgment in each case is affirmed.

BOHLING, C., concurs.

BARRETT, C., concurs as to Garner and dissents as to Pogue, Jr.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.