J. W. GARDNER v. CHARLES BANKS STOUT, WARDA STEVENS STOUT, ALICE ADELINE STOUT, Doing Business as MAJESTIC FLOUR MILLS COMPANY, and LESLIE SCHROEDER, Appellants.—119 S. W. (2d) 790.

Division One, September 17, 1938.*

*E. J. McNatt, R. K. McPherson, Arthur W. Allen* and *Paul W. Barrett* for appellants.

1208

*H. G. Waltner, Jr., Franklin E. Reagan, C. E. Reed, W. B. Myres* and *F. P. Sizer* for respondent.

FRANK, J.—Action to recover damages for personal injuries. Verdict and judgment for plaintiff for $10,000 actual and $10,000 punitive damages. Defendants appealed.

Defendants Charles Banks Stout, Warda Stevens Stout and Alice Adeline Stout are co-partners and as such own and operate the Majestic Flour Mills at Aurora, Missouri. Plaintiff was in the employ of this co-partnership and worked in said mills as a flour mixer. Defendant Schroeder was in the employ of said co-partnership as a foreman, and as such had immediate supervision over and control of the men working in said mills, including plaintiff.

The theory of plaintiff's petition is that at the time in question and while in the performance of his duties as a flour mixer, the mixing machine of which he had charge, choked and ceased to function; that defendant Schroeder appeared upon the scene and told the plaintiff if he could not properly operate the mixing machine he could quit; that plaintiff then told Schroeder that he would quit and then and there left his post of duty, got his coat and other personal belongings from a locker, told Schroeder that he had quit, and started toward the stairway for the purpose of leaving the building. Whereupon, Schroeder, in an effort to force him to return to work, maliciously and without provocation assaulted and injured him. The petition also alleges necessary facts as a predicate for the assessment of punitive damages.

Defendants' answer is in two counts. The first count is a general denial. The second count is a plea of contributory negligence in that plaintiff, without provocation or just cause assaulted defendant, Schroeder, and if plaintiff received any injuries, such injuries were the result of and directly caused and brought about by his own act of aggression in assaulting said defendant Schroeder.

The second count of defendants' answer invokes the applicability of the Workmen's Compensation Law to plaintiff's claim.

Plaintiff's reply put in issue the new matter alleged in defendants' answer.

At the close of all the evidence the employers requested an instruction in the nature of a demurrer to the evidence reading as follows:

"The court instructs the jury that under the pleadings, and all the evidence in the case, your verdict must be for defendants, Majectic Flour Mills, Charles Banks Stout, Warda Stevens Stout and Alice Adeline Stout."

Defendant Schroeder was not included in this requested instruction and no demurrer to the evidence was requested on his behalf. His failure to demur to the evidence and his voluntary submission of the case to the jury by instructions amounted to an admission that a jury case was made against him.

The employers contend that their instruction in the nature of a demurrer to the evidence should have been given because the evidence of both parties show, as a matter of law, that the mill was being operated under the Workmen's Compensation Law, and that plaintiff's claim against them is governed by that law. On the other hand, plaintiff contends that the employers waived the defense of the applicability of the Workmen's Compensation Law by not including defendant Schroeder in their demurrer to the evidence.

If plaintiff and his employers had accepted the provisions of the Workmen's Compensation Law, and were operating under that law at the time of the alleged injury, plaintiff cannot maintain this common law action for damages against his employers. His only remedy under such circumstances would be that given by the Compensation Law. [Sec. 3301, R. S. 1929, Mo. Stat. Ann., sec. 3301, p. 8232; De May v. Liberty Foundry Company, 327 Mo. 495, 37 S. W. (2d) 640; Cox v. Missouri Pacific Railroad Co., 332 Mo. 991, 61 S. W. (2d) 962; Sylcox v. National Lead Co., 225 Mo. App. 543, 38 S. W. (2d) 497; Pfitzinger v. Shell Pipe Line Corp., 226 Mo. App. 861, 46 S. W. (2d) 955.]

However, if plaintiff's claim against his employers was under the Workmen's Compensation Law, that fact would not prevent him from prosecuting a common-law action for damages against defendant Schroeder, a third person, upon whom no liability could be entailed under the Workmen's Compensation Law. [Sylcox v. National Lead Company, supra; Hanson v. Norton, 340 Mo. 1012, 103 S. W. (2d) 1.]

It will be sufficient for present purposes to say that plaintiff testified, in substance, that when he told Schroeder that he had quit, and started to leave the building, Schroeder, without justification or excuse, maliciously assaulted and injured him. This evidence made a case for the jury against Schroeder and would have compelled the overruling of a demurrer to the evidence as to him if he had requested such a demurrer. If the conceded facts show, as a matter of law, that plaintiff's claim against his employers was under the Workmen's Compensation Law, they had the undoubted right to have the

court so declare by giving their demurrer to the evidence. They would have waived that right had they included defendant Schroeder in their demurrer to the evidence, because the submissible case made against Schroeder would have compelled the overruling of the demurrer to the evidence even though no case was made against the employers because of the applicability of the Compensation Law to plaintiff's claim against them. It is, therefore, clearly apparent that by not including defendant Schroeder in their demurrer to the evidence, the employers did not waive, but preserved, their right to test the applicability of the Workmen's Compensation Law by the court's ruling on their demurrer to the evidence.

This brings us to the alleged error of the court in refusing to give the employers' demurrer to the evidence. Plaintiff concedes that he and his employers had accepted the provisions of the Workmen's Compensation Law, and that the mill was being operated under that law. His sole claim to exemption from the provisions of the Compensation Law is that he quit his employment, thereby severing the relation of employer and employee before the fight occurred. Of course, if the relation of employer and employee was severed before the fight occurred, the Workmen's Compensation Law would not govern what occurred thereafter. Whether or not the relation of employer and employee was so completely severed as to render the Compensation Law inapplicable must be determined from the evidence. The conceded facts show that when Schroeder upbraided plaintiff about the manner in which he was operating the mixing machine, plaintiff then and there told Schroeder that he would quit, immediately left his post of duty at the mixing machine, got his coat and other personal belongings from a locker, told Schroeder that he had quit and started toward a stairway twenty feet distant for the purpose of leaving the premises. The fight occurred before he reached the stairway. It is true there is a conflict in the evidence as to who struck the first blow, but we do not regard that conflict as of any significance in determining whether or not plaintiff was subject to the provisions of the Compensation Law. If his claim against his employers is governed by the Compensation Law, the Workmen's Compensation Commission and not the court has jurisdiction to hear and determine his claim. The question of who struck the first blow might be material in determining plaintiff's right to recover in the tribunal having jurisdiction of his claim, but it is of no significance in determining what tribunal has such jurisdiction.

It is our judgment that when plaintiff quit his job and immediately started to leave the building, the relation of master and servant existing between him and his employers, as well as the applicability of the Compensation Law which admittedly governed that relation, continued until plaintiff had a reasonable time to leave the premises, which the conceded facts show he did not have before the fight oc-

curred. Pertinent to this question we call attention to the case of W. B. Davis & Son v. Ruple, 222 Ala. 52, 130 So. 772. The plaintiff in that case was employed in defendants' hosiery mills. Her claim was that defendants' superintendent discharged her without cause, wrongfully assaulted her and forcibly ejected her from the premises. In discussing the applicability of the Compensation Law after such discharge, that court said:

"Plaintiff must be held to have a reasonable time to leave the premises following such discharge before it may be said that the relationship of master and servant is so completely severed as to render inapplicable the compensation statute. Such is the effect of the following authorities. [Zygmuntowicz v. American Steel & Wire Co., 240 Mass. 421, 134 N. E. 385; Mitchell v. Consolidated Coal Co., 195 Iowa, 415, 192 N. W. 145; American Bridge Co. v. Funk, 187 Iowa, 397, 173 N. W. 119; 39 C. J. 273.]"

Whether an employee voluntarily quits his employment or is discharged by his employer, such employee is entitled to a reasonable time to leave the premises of his employer, before it can be said that the relation of employer and employee is so completely severed as to render inapplicable the law which governed that relation. In the case at bar the conceded facts show two things, (1) that both plaintiff and his employers had accepted the provisions of the Workmen's Compensation Law and were operating thereunder, and (2) that after plaintiff quit his employment, the fight which caused his alleged injuries occurred before he had a reasonable time to leave the premises of his employer. We hold, therefore, that the relation of employer and employee was not so completely severed as to render the Workmen's Compensation Law inapplicable. For this reason the court erred in refusing to give the employers' demurrer to the evidence.

It is contended that a verdict of $10,000 actual and $10,000 punitive damages is so grossly excessive as to indicate passion and prejudice on the part of the jury.

This contention necessitates a review of the evidence as to plaintiff's injuries.

Plaintiff testified:

"He did not leave me alone, he hit me in the nose and I couldn't do anything. I was four feet from the head of the stairs. He hit me on the right ear. When he hit me there it knocked me against the wall. I had a place on my shoulder where it was burned against the wall. It hurt my arm. . . . He hit me a time or two again. I couldn't say whether he hit me when I was down. I was numb. I went home. I was bleeding when I left. . . . My wife called Dr. Cowan the next day. He treated me five or six or seven times, I don't remember exactly. I was in bed two weeks. My shoulder was stiff and sore for a long time. It does not hurt me now. In my right ear there is a roaring, and my eyes glimmer. It doesn't bother

me from reading, they just dance and glimmer. My ears do not disturb my sleep. I can't do any manual labor. I give way all over. I haven't done any thing since then but light labor. My eyes affect me and my head hurts all the time. . . . The thing that keeps me from doing any physical work is that I am run down all over. I had chills before I was hurt and have had some since. It has been worse since. I spit blood for about a month. The roaring in my ear continues. I think it is getting a little better."

Plaintiff's wife described his condition as follows:

"There was a cut on his right cheek and in front of the right ear, and one on the left side of his cheek. I saw a burned place on his left shoulder. I called Dr. Cowan. He has always been our family doctor. My husband was in bed two weeks. He was suffering in his head and back. He could not sit up. He cannot sleep now. He did not have the winking and blinking of his eyes before this time. That has come on since. Years ago my husband was subject to chills. When he went back to work he had one spell of them. I think it was about a week before this happened. I think at the time he laid off three nights. He had chills before and when he went back to work this time he had them again. I think you call them dust chills. He still has chills and they last about fifteen minutes. He does not sleep well."

Dr. Cowan, called by plaintiff, testified as follows:

"I remember being called to see Mr. Gardner last October 3. He had some concussion, I thought, and he had an abrasion on the nose and right side of the face under the eye, and his external ear was skinned up some. His right nostril was clotted with blood. There was some blood on the right ear. I couldn't say how long the concussion seemed to affect him. I called on him on October third, fourth, fifth and eighth. I did not see him at home any more. The last time I saw him was on October 22, 1934. At that time he complained of being dizzy. I found no evidence of any roaring in his ear except what he said. If he still has a roaring and has had it every since his ear was struck I would rather let an expert testify as to what it should be attributed to. I am not an expert on the eye, ear, nose and throat. I wouldn't know whether a blow on the side of the head sufficient to cause the injuries I found him suffering from would cause the roaring in the head."

On cross-examination, Dr. Cowan testified as follows:

"I saw Mr. Gardner about nine o'clock the morning of October 3rd early in the morning. His right nostril was clogged with blood like a man having nose bleed. I don't think the nose was fractured. It was swollen. I found an abrasion of the outer ear. The ear canal was swollen. Later on I looked in the ear and the swelling had gone down. I looked in the ear with a light. That was on the 22nd and

I didn't find anything abnormal inside the ear. The ear drum was normal. I did not try the vibratory sense at all. I didn't see anything wrong at all, though. The swelling of the outer ear had all subsided. At that time there was no injury to the outer ear. I think the only way an injury to the outer ear could affect the hearing would be to cause a swelling and reduce or stop up that canal. If that opening returns to normal the injury to the outer ear would not have anything to do with the man's hearing if everything else was normal. I have looked in a great many ears and know what a normal ear drum is when I see it. His ear drum was normal. I suppose if the ear drum is normal a man usually has normal hearing. When I checked this man's ear on the 22nd I did not find anything that could cause me to conclude that his ear was not normal. The best I could tell it was normal.

"His nose had cleared up at that time. The abrasion under the right eye had cleared up. I don't think there were any external signs of injury to the face or nose. At that time I would say the concussion was gone. Concussion is a shock. Mr. Gardner was in the office a time or two after October 22nd. On the 22nd when I examined him the only thing I found pathological was that he had large, dilated pupils which reacted very little to light. Pathological means out of normal. I would say he was a fair average normal man.

"Before this time I had treated him when he had the flu a time or two and bronchitis followed."

He further testified that a blow on the outside of the ear sufficient to cause the injury he found could have hurt one of the three conductors on the inside of the drum, and if he complains as he does now and the experts find that the bone conduction is limited one-half, this long after the accident, he would consider him permanently hurt.

Dr. Moore called by plaintiff testified as follows:

"He gave me the history of a head injury, complained of difficulty in hearing, and noises in the right ear, which was the side upon which he claimed that he had had a head injury; there was some loss of sensation around the ear; the inflammatory condition had subsided at this time. The bone conduction was 10/20, which would be 50 per cent normal, and the air conduction was 15/40, which means in percentage thirty-seven and a half per cent normal; the canal was still somewhat congested and thickened; the size of the canal was less than normal, but normal color; and the ear drum normal color, but retracted. He had a spasmodic winking of the eyelid, which was, in my opinion, a result of the first and second division of the tri-facial nerve. He gave me a history of suffering from bruises about the head. He stated that he had a roaring in his ear. I found the right eye a little bit above normal and the left eye exactly normal, according to standard tests. The bone conduction shows the condition of the internal ear. If the internal ear is injured the conduction will be down

usually in proportion to the injury. The bone conduction was off fifty per cent from normal, and the air conduction was thirty-seven and a half per cent normal. The reason for the difference was because the drum membrane was retracted and only partial vibration would make the difference; the function of the middle ear was partially destroyed. My prognosis of the condition of the ear is not favorable to normal conduction recovery. It was about eight months after his alleged injury that I examined him, on the seventh day of May. If the same condition existed now with reference to the roaring in his head I would be more positive as to a permanent injury."

Dr. F. T. H'Doubler, who by agreement of the parties, examined plaintiff, was called as a witness by defendant. He testified as follows:

"I found his chest well formed and symmetrical. He had a depression along the sternum, which is called the funnel breast. It is congenital, a thing acquired in the growing period. I found no abnormalities in the lungs. I found no abnormalities about the heart, its action was regular, slow and of good quality. His reflexes were exaggerated, more action than normal. This I attributed to nervousness.

"I made an examination of the external ear and drum and tested his hearing by what we call whispered voice test. His hearing was normal. He is of slightly better hearing on the left side than on the right. It is the rule more often than otherwise for a man to hear out of one ear better than he does out of the other. The opening that goes into the ear is the outer, or external ear. There was no evidence of damage or swelling. The opening was normal. The ear drum was normal, and the vibrations normal. I did not see anything from my examination of his ear that was abnormal or out of the ordinary, and did not see anything that might affect his hearing.

"I gave him a thorough examination. I took his history and tried to cover everything that might have happened to him since he was born, and examined him from head to foot. I could not find any evidence of any organic injury, that is, any injury that would be received by a physical change in his body in any way. I think he was able to work. His pulse rate was 72, blood pressure normal. I found nothing to indicate that he was suffering at the time from a concussion of the brain."

Viewing the evidence in a light most favorable to plaintiff, we find no substantial evidence of a permanent injury except to the right ear. The only evidence of a permanent injury to the ear is that given by Dr. Moore. He testified that the bone conduction was fifty per cent normal and the air conduction was thirty-seven and one-half per cent normal; that the function of the middle ear was partially destroyed; that his prognosis of the condition of the ear was not favorable to normal conduction recovery; that he examined plaintiff eight months

after the injury, and "if the same condition existed now with reference to the roaring in his head I would be more positive as to a permanent injury."

Concerning the roaring in his ear, plaintiff testified that his ears did not disturb his sleep; that he did not suffer from the roaring in his ear, but it was a nuisance; that he thought the roaring was getting a little better. He did not testify that his hearing was impaired, or that he had any trouble in hearing. He testified that his eyes "danced and glimmered" but it did not bother him from reading. No witness testified that this condition was permanent.

Plaintiff was injured on October 2. Dr. Cowan, plaintiff's witness and family physician, examined him the last time on October 22. He testified that plaintiff's ear was normal; that all external signs of injury were gone; that the concussion was gone; that the only thing he found not normal was dilated pupils of the eye, to which he did not attach much significance; that plaintiff was a fair average normal man.

Dr. F. T. H'Doubler, defendants' witness testified that on examination of plaintiff, he found that his ear was normal and his hearing good; that there was no evidence of organic injury; that there was no abnormalities of the heart or lungs; that his pulse rate and blood pressure were normal; that he thought plaintiff was able to work.

While plaintiff testified that he had not been able to do any manual labor since his injury, there is no evidence that his inability to do so was caused by the fight he had with Schroeder. On the contrary, his own witness, Dr. Cowan attributes his condition to disease which he had before the time of the alleged injury. On that subject, the doctor said:

"When I saw this man on October 22, I don't think he was a real strong man. I only saw him a couple of times after that. I thought he had gotten over his accident and I thought a secondary anemia accounted for part of it. Anemia is a disease of the blood. It would not necessarily be connected with the accident. I don't know whether he had that prior to the accident. As I remember he had that at the time but it did not come from the accident. He had a rather severe bronchitis which I thought would account for secondary anemia. He had had the bronchitis before the accident."

In passing upon the motion for new trial, the trial judge stated there was no question in his mind but what the verdict was excessive, but he thought it should be left to the Supreme Court to reduce the judgment because it was excessive. He stated that the case seemed to be one of considerable agitation on both sides. He referred to the sentiment, excitement and feeling that had been created in the trial, and warned against the repetition of such conduct in future trials.

There are cases where the size of the verdict alone would dictate that it should be set aside. Where the amount is so glaringly unauthorized by the evidence, and so grossly excessive as to compel the conclusion that the verdict was the result of passion and prejudice on the part of the jury, it should be set aside. Our judgment is that the verdict in this case of $10,000 actual and $10,000 punitive damages is so grossly excessive and so out of proportion to the injuries shown by the evidence, as to force the conclusion that it was the result of passion and prejudice on the part of the jury, and should for that reason be set aside. However, we need not rest this conclusion on the size of the verdict alone. [6] We have no doubt that passion and prejudice which prompted the rendition of this excessive verdict, was planted in the minds of the jurors by the agitation, sentiment, excitement and feeling which the trial judge says was created in the case.

Appellants vigorously assail the argument made by plaintiff's counsel to the jury.

Since the case must be reversed for the reasons heretofore stated, we will not set out or discuss the argument made, but will say for the benefit of counsel in event of a retrial, that we do not approve the argument.

The judgment is reversed and cause remanded as to appellant Schroeder. As to all other appellants, the judgment is reversed outright. All concur.