Almeda WOLFE and Earl Wolfe, Respondents,

v.

Eula Mae HARMS, Administratrix of the Estate of Velmar John Harms, deceased, Charles Kast, d/b/a M. F. A. Service Station, Charles Mehls and Southwest Freight Lines, Inc., Appellants.

No. 51641.

Supreme Court of Missouri, Division No. 1.

March 13, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied April 10, 1967.

William F. Brown, James T. Buckley, Sedalia, for plaintiffs-respondents.

John R. Gibson, Morrison, Hecker, Cozad & Morrison, Kansas City, Wesner, Wesner & Meyer, Sedalia, for defendant-appellant, Eula Mae Harms, Admx. of Estate of Velmar John Harms, Decd.

John R. Gibson, Morrison, Hecker, Cozad & Morrison, Kansas City, Wesner, Wesner & Meyer, Sedalia, for defendant-appellant, Charles Kast.

Jack G. Beamer, McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, Lamm, Barnett, Crawford & Barnes, Sedalia, for defendants-appellants, Charles Mehls and Southwest Freight Lines, Inc.

HIGGINS, Commissioner.

Action for damages for personal injuries in which verdict and judgment were for plaintiffs, Almeda Wolfe and Earl Wolfe, for $75,000 and $13,500, respectively, against all defendants. Defendants Mehls and Southwest Freight Lines, Inc., were denied a new trial; defendants Harms and Kast were awarded a new trial on liability only, and the verdict in favor of plaintiffs against Mehls and Southwest was ordered held in abeyance pending the retrial of liability of Harms and Kast. All defendants have appealed.

On September 25, 1965, Earl Wolfe and his wife, Almeda, lived on the Velmar Harms farm five miles south of Sedalia, Missouri. Mrs. Wolfe and Mrs. Harms made an arrangement by telephone for Mr. Harms to ride with the Wolfes in their car to Bothwell Hospital in Sedalia to see Mrs. Wolfe's brother. Mrs. Harms was to stay at home and care for the Wolfe children. Instead of the arrangement made, Mr. Harms suggested that they go in a Dodge automobile owned by Roy Ford and they left the Harms home in the Dodge with Mr. Harms driving. They were at the hospital about forty-five minutes and, upon leaving, were to go to the M.F.A. station to deliver the Dodge to Mr. Ford. They were to use Mr. Harms's truck for the remainder of the trip home. Mr. Harms was driving the Dodge, Mr.

Wolfe was on the right side of the front seat and Mrs. Wolfe was in the middle of the front seat. They proceeded in a southwesterly direction on Clinton Road toward its intersection with U. S. Highway 65 just south of the city limit of Sedalia. Highway 65 there is a 24-foot pavement and runs generally north and south without curves or other obstructions to vision. It is a through street protected by stop signs at intersecting streets including Clinton Road and 32nd Street which also intersects Highway 65 at this point but at right angles. The M.F.A. station is on the southwest corner of the intersection. The Dodge arrived at the intersection at about 8:30 P.M. It was dark or nearly so; Harms's headlights were lighted, as were lights of businesses along the highway. The weather was fair and the streets were dry.

According to the Wolfes, Harms stopped the Dodge five or six feet northeast or back of the stop sign located on the right side of Clinton some thirty-six feet from the east edge of the paved portion of Highway 65. Harms asked Earl Wolfe, "Is it clear your way?" and Earl replied, "It is clear my way, but you have got two cars coming your way." While they were stopped there two cars passed in front of them going north on 65, and then the clearance lights of the Southwest Freight Lines truck, driven by Mehls, were observed as the truck came over a slight hill some 932 feet south of the intersection. They then moved up to the edge of the pavement and stopped again. It appeared that Harms also looked in the direction of the truck, plaintiffs called his attention to the truck and, prior to the second stop made by Harms, Earl said, "You better hold it. Here comes a truck." So far as plaintiffs knew, Harms's hearing was all right. Harms then proceeded a short distance to his second stop or "almost to a dead stop" at the edge of the pavement and then proceeded to cross the highway going slowly. The truck appeared to Mrs. Wolfe to be going rather fast and Earl judged its speed to be at least 50 miles per hour and it did not slow. He judged the speed to be at least 40 miles per hour in the intersection. When the car entered the highway, the truck was said to be in front of a Texaco station which Earl estimated to be 200 feet from where the vehicles came into collision and which measured 420 feet from the impact. Mrs. Wolfe estimated the speed of the Dodge at five to ten miles per hour as it proceeded across 65, and Earl judged its speed at five or six miles per hour. Both thought Harms could have stopped before crossing the northbound lane of 65. Plaintiffs did not warn or caution Harms further. They thought he was aware of the truck and that he would get them across the highway safely. According to plaintiffs the truck crowded the center line of the road from back by the Texaco station and then crossed the center line 30 to 40 feet south of the Dodge. "It looked like it tried to head us off." They were blinded by the truck's lights but saw the collision as occurring in the west or southbound lane of the highway. Mrs. Wolfe said the Dodge was straddling the center line when struck by the truck. Earl, although having made a similar statement the day after the accident, visited the scene four days after the accident and, upon noting a skid mark which crossed the center line 30 to 40 feet south of the impact, testified that the impact was in the southbound lane. The impact was to the left side near the center of the Dodge and to the left front corner of the truck. The damage to the Dodge was most extensive between the fenders on the left side. The right side of the front of the truck was not damaged. Neither of the plaintiffs heard any warning from the truck.

The truck was a tractor-trailer owned and driven by defendant Charles Mehls under lease to defendant Southwest Freight Lines, Inc. The tractor weighed 13,300 pounds, the weight of the trailer was not known, and it was loaded with 28,000 pounds net weight of beef, a total weight

of something in excess of 41,300. Mehls said he left Springfield, Missouri, around 6 P.M. and traveled at speeds varying between 40 and 50 miles an hour. His lights were lighted and, as he drove down the incline on Highway 65 toward its intersection with Clinton Road, his speed was 30 to 40 miles per hour. He was familiar with the road and the several businesses, entries, and streets in the area leading to the intersection. He saw the Harms car approaching the highway from the northeast on Clinton Road. He did not recall where his truck was when he first saw the car and recalled in his deposition only that he was "medium distance * * * about three hundred to ten feet," from the car as it entered the highway. He testified that the car started out slowly when he was 80 to 120 feet from it. He used his right hand to pull the lever which operated the brakes on the rear tandem dual wheels of the trailer, stepped on the foot brakes of his tractor, and attempted to steer to the left with his left hand. He did not sound his horn. According to him, the collision occurred on the right-hand side of the center line and the truck thereafter swerved to the left and off the highway.

The truck proceeded on northwesterly and came to rest headed into an embankment on the west side of the highway near the Holiday Inn with the right rear duals on the highway. The Dodge was farther north a short distance and to the right of the truck.

John Mergen went to work at the M.F.A. station at 2 P.M. He was an employee of Harms and defendant Charles Kast who were partners doing business on the southwest corner of the intersection as M.F.A. Service Station. He saw Harms at the station that afternoon but did not recall seeing the Dodge or hearing any statements about it. He was standing in front of the station servicing a car when he heard air brakes go on and looked up to see the Southwest truck pass in front of the sta-

tion at a speed of around 40 miles per hour. He did not see the Dodge until the impact which occurred at a point behind the left front wheel and at a point when the front end of the Dodge was "a foot or two on the left side of the center line."

Lorren Griffith, a truck driver, was driving a car behind the truck and estimated its speed at 30 miles per hour on the incline and 25 miles per hour at impact. He heard the truck's brakes go on when it was about 100 feet from the intersection. "It looked like, about the time the impact come, the car jumped right square in front of the truck."

Victor Stohr was driving southbound on Highway 65. He saw Harms approach on Clinton Road and judged his speed at 10 to 20 miles per hour. Harms slowed down in the last 20 feet before the slab but did not stop. He judged the truck's speed at 30 to 35 miles per hour and placed the collision east of the center line.

Officer Charles Knapp placed a dot on a plat of the area at a point a foot east of the center line to show a place where he found debris from the collision. He said it was possible for that debris to have come off the rear as well as from the front of the Dodge. He saw two sets of skid marks which crossed the highway and marks from the rear wheels of the trailer led back 22 feet to the debris and 97 feet beyond to the south.

The collision resulted in the death of Velmar Harms and serious injuries to Earl and Almeda Wolfe.

■ Appellants Mehls and Southwest contend that plaintiffs failed to make a submissible case against them for the reason that the evidence failed to show that Mehls was driving at an excessive speed or on the wrong side of the road, or failed to sound a warning, and that such acts were the proximate cause of plaintiffs' injuries.

Plaintiffs, having submitted three improper acts in the disjunctive, must, of course, have evidence to support all of such acts or the submission will be erroneous. See Notes on Use, MAI 17.02.

■ All estimates of the speed of the truck were within the 60-miles-per-hour speed limit for trucks in rural areas at night. However, excessive speed is a relative matter, and whether speed is excessive ordinarily depends upon the condition of the highway and surrounding circumstances. Chenoweth v. McBurney, 359 Mo. 890, 224 S.W.2d 114, 118[9]; Bear v. DeVore, Mo.App., 177 S.W.2d 674, 676 [1, 2]; Bramblett v. Harlow, Mo.App., 75 S.W.2d 626, 630 [7]. This collision occurred at a 6-way intersection made by U. S. Highway 65, Clinton Road, and 32nd Street at the south city limit of Sedalia, Missouri. The area plat and photographs in evidence show the M.F.A. Service Station at the southwest corner, a Skelly station at the northeast corner, and a welding shop in the "V" made by Clinton Road and 32nd Street at the east of the intersection. A Holiday Inn motel is at the northwest corner with two access lanes to Highway 65. As Mehls approached the intersection he traveled 932 feet down an incline in Highway 65 which was lined with no less than six business places with their attendant access drives. There were signs indicating the intersection; darkness had caused lights to be lighted; and there were other vehicles traveling the highway. Mehls was familiar with the area and its congestion as opposed to the rural character of the scene in Pitts v. Garner, Mo., 321 S.W.2d 509, and in Harris v. Goggins, Mo.App., 363 S.W.2d 717. He was aware of the Dodge approaching the intersection on Clinton Road and, even though he was entitled to assume, in the absence of circumstances which would put a reasonable person, in the exercise of the highest degree of care, on notice that the assumption was unwarranted, that the Dodge would stop before entering the highway, Collier v. St. Louis Public Service Co., Mo.App., 298 S.W.2d 455, 460 [3-5], he did in fact see the car enter the highway. Earl Wolfe judged the truck's speed at 50 miles per hour when he first observed it and 40 miles per hour prior to impact. Witness Stohr made a "rough guess" that the truck was going 30 to 35 miles per hour, and witness Griffith, although saying to himself, "that truck is really pushing tonight," placed its speed at around 30 miles per hour. Witness Mergen said the truck's speed was "at least 40 miles per hour." Although skidding is as consistent with care as with negligence and alone is no evidence of excessive speed, it, too, may be considered, along with other circumstances and conditions in determining the question of negligent speed. Annin v. Jackson, 340 Mo. 331, 100 S.W.2d 872, 876 [3]; Neely v. Freeze, 240 Mo.App. 1001, 225 S.W.2d 144, 154 [5]; Greenwood v. Vanarsdall, Mo.App., 356 S.W.2d 109, 112 [1-3]; Evans v. Colombo, Mo., 319 S.W.2d 549, 550-551 [1]; Bear v. DeVore, supra, 177 S.W.2d 1. c. 676 [4]. Thus, the additional circumstances of 119 feet of tire marks leading south from the truck are available for the jury's consideration. Also available is the evidence of the ultimate resting place of the vehicles, the truck against an embankment and the Dodge to the right and forward of the truck. A jury could properly consider all these facts, and they were sufficient to make a submissible case on the issue of whether defendants negligently drove at an excessive speed and whether that was a proximate cause of the collision and resulting injuries. Bramblett v. Harlow, supra, 75 S.W.2d 1. c. 630 [7-9].

■ These appellants contend that the probative value of Earl Wolfe's estimate of speed of the truck at 50 miles per hour when about 200 feet to the south is destroyed by his testimony that the truck was then at the Texaco station, shown to be 420 feet from the collision scene, at the time when the Dodge entered the highway; that

such renders his testimony so unreliable as to deprive plaintiffs of entitlement to the most favorable inferences from his testimony. Sammons v. Kansas City Public Service Co., Mo.App., 179 S.W.2d 620, 623; Stonefield v. Flynn, Mo.App., 347 S.W.2d 472, 477 [5]; Stephens v. Thompson, Mo., 293 S.W.2d 392, 394 [1, 2]. Appellants make a calculation with the use of that testimony and plaintiffs' estimate of the speed of the Dodge at five to six miles per hour to show that the truck would have had to go 140 miles per hour, "a speed which it obviously was not capable of attaining," Bear v. DeVore, supra, 177 S.W.2d l. c. 677 [6], in order to come into collision with the Dodge. When Earl's judgment as to the position of the truck was made he was sitting in an automobile headed southwesterly at the edge of Highway 65. The Texaco station was on the west side of the highway and 420 feet south of the ultimate point of collision between the truck and the Dodge. In the angle in which Earl's view of the truck was framed it was reasonable for the jury to believe that for some distance between the station and the intersection the truck would look "like it was about at the Texaco station, up along there." Such testimony admits of some variance and elasticity and is not so inconsistent with his other judgment of the truck's distance near the Texaco station at 200 feet as to be destructive of probative value on account of confusion, utter incredibility, or conflict with plaintiffs' theory of the case. Montgomery v. Petrus, Mo.App., 307 S.W.2d 24, 27 [3, 4]. And it was proper for the jury to consider this testimony as well as the equally elastic testimony of Mehls that the vehicles were ten to three hundred feet apart when the Dodge entered the highway along with all the other evidence in resolving the issue of excessive speed.

■ Plaintiffs testified that the collision occurred in the southbound lane of Highway 65; that Mehls drove the northbound truck on the wrong side of the road,

"it looked like it tried to head us off," and Mehls admitted that he cut the truck to his left prior to collision. Witness Stohr was southbound and swerved over to the northbound lane to avoid hitting the collided vehicles. Witness Mergen saw the collision as occurring when the front of the Dodge was left of the center line of the highway, and Officer Knapp located a point of debris six inches east of the center line which could have come from either the front or rear of the Dodge. He testified also that the truck came to rest with only its right rear duals on the highway and that the truck had made an abrupt and sudden turn to the left. Witnesses Mehls and Stohrs located the point of impact on the east side of the highway. Thus, there was evidence upon which to submit the issue of whether Mehls drove on the wrong side of the road and whether such act proximately caused the collision with the Dodge, and it was for the jury to resolve conflicts in the testimony as well as the issue itself.

■ These appellants argue that the truck was not on the wrong side because the tire marks which led from the rear of the truck were caused to cross the center line south of the impact "when the front of the truck was pushed to the west by the force of the impact." The tractor trailer, and load weighed in excess of 41,300 pounds, and it came to rest after the collision with the Dodge forward and to its right. Damage was to the left front of the truck and to the left side of the Dodge, mainly between its fenders. It was proper for the jury to consider these additional facts in determining the probable paths of the colliding vehicles and whether the truck drove on the wrong side of the road or whether it was "pushed" there by the Dodge automobile. Thompson v. Jenkins, Mo., 330 S.W.2d 802, 805 [3].

These appellants argue also that the truck was not being "driven" anywhere but was skidding or sliding, Wray v. King, Mo.App., 385 S.W.2d 831, 834 [6], Doyle

v. Wilmesherrer, Mo., 358 S.W.2d 837, 841 [7], Prince v. Bennett, Mo., 322 S.W.2d 886, 890 [2], Evans v. Colombo, supra, Girratono v. Kansas City Public Service Co., 363 Mo. 359, 251 S.W.2d 59, or was cut to the left in emergency action, Borrini v. Pevely Dairy Co., Mo.App., 183 S.W.2d 839, 845 [7, 8]. This is not a case where the evidence shows the truck to have gone to the left as an obvious result of a skid or slide on ice, but is one which can be resolved on evidence from which a jury could properly find that the skid or tire mark resulted from braking action and that it showed the path of the braking vehicle which, together with the other facts, warranted submission to the jury of whether Mehls drove on the wrong side of the road and into collision with the Dodge.

■ Plaintiffs heard no warning and Mehls admitted that he did not sound one but his duty to do so would arise only when the exercise of due care upon his part would lead him to believe a collision would occur. Greenwood v. Bridgeways, Inc., Mo.App., 243 S.W.2d 111, 114 [4–7]; Stakelback v. Neff, Mo.App., 13 S.W.2d 575 , 577 [2]; Nydegger v. Mason, Mo., 315 S.W.2d 816, 820 [3]. The evidence is such that a jury could reasonably find Mehls aware of the Dodge slowly crossing the pavement at five to six miles per hour, when he had 200 to 400 feet in which to warn and thus give plaintiffs' host, Harms, notice of his danger and an opportunity to accelerate the Dodge and move it twelve feet out of the danger then existing in the northbound truck's proper lane of travel. This situation is not like that in Vietmeier v. Voss, Mo., 246 S.W.2d 785, where the plaintiff ran into the side of defendant's vehicle and under his humanitarian submission it could not be demonstrated that the plaintiff, after hearing a horn, could have stopped short of running into defendant's vehicle. Here, the jury could find that Harms had only to pass in front of Mehls in order to reach a place of safety if Mehls continued on his own side of the highway, and whether the failure to warn

was negligence and a proximate cause of the collision was properly for the jury.

■ These appellants argue that plaintiffs and Harms were aware of the danger and proceeded to "outrace" or "beat" the truck, as in Yeaman v. Storms, 358 Mo. 774, 217 S.W.2d 495, 500 [6], Pitts v. Garner, supra, and that sounding a horn would not have given any notice that they did not already have. Peterson v. United Rys. Co. of St. Louis, 270 Mo. 67, 192 S.W. 938, 940 [3]; De Wolf v. Stix, Baer & Fuller Dry Goods Co., Mo.App., 240 S.W. 1094, 1095; Bach v. Ludwig, Mo. App., 109 S.W.2d 724, 730 [10]; Dister v. Ludwig, 362 Mo., 162, 240 S.W.2d 694, 700 [11]. This argument recognizes only that plaintiffs were aware of the oncoming truck and that they warned their host of its approach. It does not recognize that plaintiffs were but passengers and overlooks the apparent failure of Harms, their driver, to appreciate and heed their warning. There is evidence from which the jury could determine this to be the case rather than to find that Harms, with plaintiffs' acquiescence, was racing to beat the truck.

■ Appellants would extend this last argument to say that plaintiffs were guilty of contributory negligence in failing to caution their driver after it became apparent that he intended to cross the highway in the path of the oncoming truck. This is on the theory that "[w]hen dangers, which are either reasonably manifest or known to an invited guest, confront the driver of a vehicle, and the guest has an adequate and proper opportunity to conduct or influence the situation for safety, if he sits by without warning or protest and permits himself to be driven carelessly to his injury, this is negligence which will bar recovery", Thurman v. St. Louis Public Service Co., Mo., 308 S.W.2d 680, 684 [3], and that they had no right to ask Mehls to take more care of them than they did of themselves. Yeaman v. Storms, supra, 217 S.W.2d 1. c. 500 [6]. The other side

of this issue is that "[i]n the absence of visible lack of caution of the driver or known imminence of danger, a guest may ordinarily rely upon a driver who has exclusive control of the vehicle." Toburen v. Carter, Mo., 273 S.W.2d 161, 164 [1, 2]; Flint v. Chicago, B & Q R Co., 357 Mo., 215, 207 S.W.2d 474, 479 [4, 5]. Previously stated testimony of plaintiffs shows that as Harms approached the highway plaintiffs observed traffic both to right and left, observed their driver looking to the left, and warned him of the oncoming truck. Such indicates that plaintiffs did not sit by; that they cared for themselves, and caution on the part of their driver as well. "Contributory negligence may be established as a matter of law under certain circumstances, but only when reasonable minds could not differ as to plaintiff's negligence." Dickerson v. Terminal Railroad Ass'n of St. Louis, Mo., 284 S.W.2d 568, 573 [12]. These plaintiffs were not in control of the Dodge, a situation which reduced them to timely warning as their means of averting the collision. The circumstances of this case are thus not conclusive of contributory negligence as a matter of law and they warranted submission of that issue to the jury.

■ These appellants also seek review of a charge of error in giving Instruction No. 7 "in that it failed to require a finding that Mehls knew or by the use of the highest degree of care would have known that there was a reasonable likelihood of a collision in time thereafter to have sounded a warning and thereafter have avoided a collision." Appellants' only objection at trial to this instruction was general, and in their motion for new trial their complaint was limited to: "Under the facts of this case, failure to sound warning was not actionable negligence." Evidentiary support for failure to sound warning as actionable negligence has already been demonstrated, and comparison of the two quotations demonstrates that the point urged here is not the point presented in the motion for new trial. Con-

sequently, the charge is not for discussion because "in order to preserve for appellate review a challenge to an instruction, tion, (the) specific objections must be made either at the time of trial or in the motion for new trial. See Civil Rules 79.02 and 79.03, V.A.M.R." Moll v. Springdale Park, Inc., Mo., 395 S.W.2d 126, 128 [2, 3].

■ These appellants also complain of Instruction No. 18 which contained, among other things, directions and forms covering twelve verdicts against different defendants and combinations of defendants. It is their contention that the part of the instruction which authorized such a verdict and the verdict itself:

"No. 1

"We, the undersigned jurors find in favor of the plaintiff Almeda Wolfe and assess her damages at $75,000.

"No. 2

"We, the undersigned jurors, find the issues in favor of the plaintiff Earl Wolfe and assess his damages at $13,-500."

do not conform to MAI 32.05 because the defendants against whom it was rendered are not named. It would have been better for the court to have suggested a form of verdict against all defendants which used the inclusive word "all" or required naming all the defendants. However, this verdict is in the exact language which the court directed the jury to use in the event the verdict was "against all of the defendants." It has been noted in a case of two defendants that "both defendants were sued, and, as the verdict fails to state otherwise than that it was against both, the verdict was proper", Scott v. McLennan, Mo. App., 242 S.W. 140, 143 [7]; and the verdict expresses the clear intent of the jury without ambiguity or uncertainty, State v. Russell, Mo., 265 S.W.2d 379, 382 [7], a quality not present in the faulty verdict in Thorne v. Thorne, Mo., 350 S.W.

2d 754, 756, which the trial court attempted to make whole by interpolation after discharging the jury.

 Appellants suggest that loss of services of a spouse is a property damage and argue that the verdict is defective for failure to "state separately the amount allowed for the aggregate of the items of damage connected with the personal injury and the amount allowed for the aggregate of the items of damage connected with the injury to the property." Civil Rule 71.06, V.A.M.R. This verdict does not violate the rule for the reason suggested by appellants because an action for the loss of a spouse's services is a "purely personal and domestic right" and not a wrong done to the property of the injured party. Toomey v. Wells, 218 Mo.App. 534, 280 S.W. 441, 443 [3]. See also Mennemeyer v. Hart, 359 Mo. 423, 221 S.W.2d 960, 962 [3]. Furthermore, the record reveals no request for separate submission of such items of damage.

 Plaintiffs' jury argument contained the following:

"MR. BUCKLEY: * * * Now I want to read you Instruction No. 9. This is the instruction that was offered by the defendant Southwest Freight. It was accepted by the Court and it was read to you today and of course it should—MR. BEAMER: If the Court please, this is entirely improper. MR. BUCKLEY: I am just reading the instruction Mr. Beamer gave to the jury.

"THE COURT: It is not Mr. Beamer's instruction. These instructions, ladies and gentlemen of the jury, come from the Court, are not any lawyer's instructions, should not be referred to by counsel [as] anybody's instruction.

"MR. BUCKLEY: Right. I realize that.

"THE COURT: Disregard that statement that Mr. Beamer had anything to do with this instruction. I am responsible for the instructions.

"MR. BEAMER: Defendant Mehls and Southwest move to dismiss the jury.

"THE COURT: The motion will be overruled."

These appellants recognize that such a ruling as the court made is normally within the court's discretion, but they argue that the nature of the ruling conveyed an impression that the court thought these appellants were at fault and should be so held in the case; that the case was close involving local people and severe injuries; that under such circumstances nothing short of discharging the jury would afford a fair trial, as in Mooney v. Terminal R. Ass'n of St. Louis, 352 Mo. 245, 176 S.W.2d 605, 611 [15], where counsel argued "[t]here is no doubt in my mind or the Court's mind" that a close case could be submitted. See also McGowan v. Wells, 324 Mo. 652, 24 S.W.2d 633, 639 [9]. The quoted argument does mistakenly credit an instruction to a party; however, the court promptly instructed the jury to disregard counsel's statement and the admonition that the instructions "come from the court" is completely accurate because "the instructions are the Court's." Role of the Trial Judge, MAI, p. XXXV. Under these circumstances the court is not guilty of improper comment, Martin v. Sloan, Mo., 377 S.W.2d 252, 260 [13]; and the accuracy of the remark is inconsistent with any abuse of the considerable discretion allowed the court in controlling arguments and removing any prejudice which might result from improper argument. McClintock v. Terminal R. R. Ass'n of St. Louis, Mo.App., 257 S.W.2d 180, 188 [16]; Bracken v. Koch, Mo.App., 404 S.W.2d 201, 206 [9].

Appellant Kast contends he should have had a directed verdict on the theory that the evidence showed as a matter of law that Velmar Harms was not engaged in partnership business but was on a personal mission at the time of the collision, thereby

freeing Charles Kast from liability for acts of Velmar Harms.

Mr. Kast admitted that he and Harms started operating the M.F.A. Service Station in 1958. "We both were in a fifty-fifty operation of the lease." They had an equal amount of authority and continued as a partnership through September 25, 1963. Mr. Kast arrived at the station that day at 2 P.M., and Harms left shortly after "in this Dodge automobile that belonged to Roy Ford." Harms "had lubricated, changed oil, and changed the filter in the car, and had tried to adjust the brakes on the car." The purpose of Harms having the car was "to deliver it back to Ford." So far as he knew, the car would be delivered to Ford at the Adco plant. Roy Ford worked at Adco and had worked extra at the M.F.A station for about four years. On the morning of September 25, 1963, he took his 1961 Dodge to the station and left it to be serviced. He took Harms' pickup truck and drove to work. When finished, Harms was to bring the car to him and take his truck as he had done before. "The biggest part of my work I ever had done, while they were out there, I let them do it. * * * Whatever amount I owed, he's got a box out there and he just puts the receipt in the box where I owed so much." This was the usual way of operating and he paid his bills at the station. In respect to the car being returned at Adco, Ford testified: "Well, he came down by at two o'clock and that is when they change shifts at the service station. He came by and he told me that, you know, he wants—to start with, I told him that I had a brake shoe or something dragging, to check it. He came by and he told me that they was busy out there and he wanted, if it would be all right with me, that he would take the car home and work on it at his house. He said, if it needed brake shoes, he would put them on. That was it. He just took the car. I naturally told him to do whatever it needs to be done to it. He took the car, and that was it. * * * I was

supposed to work extra that evening and he told me to go on and take the pick-up truck. When I went to work, just go on to use his pick-up and he would bring the pick-up out to—or rather, he would bring the car and he would get his pick-up." On that evening the Wolfes went to the Harms home pursuant to an arrangement "that Mr. Harms would ride to the hospital with us, in our car, to see my brother." Mr. Harms had a different plan, however, saying, in reference to Ford's Dodge, "You all go with me in this car." "* * * he was to deliver it back to the station that night for Mr. Ford." On the way to the hospital Mr. Harms tested the brakes to see if they were working all right, and, upon leaving the hospital, the three started to the M.F.A. Service Station to deliver the Dodge to Roy Ford and proceed on home in Harms's own vehicle.

The thrust of this appellant's argument is that "It is evident from all of the testimony * * * that the chief purpose in the trip in question was the trip to the hospital with the Wolfes and that any purpose in delivering the Roy Ford vehicle back to the service station was purely remote and incidental to the personal mission of Velmar Harms. Under these circumstances Charles Kast, Harms' partner, should not be held liable." This argument recognizes, by implication at least, that his partner's trip to the M.F.A. station was partnership business, but liability for the accident occurring during that trip would be avoided by arguing that mission to have been remote and incidental to Harms's personal mission to the hospital.

"In general, the partners and the firm are liable to third persons for injuries resulting from wrongful omissions or acts of a copartner while acting within the general scope of the firm's business," 68 C.J.S. Partnership § 168, p. 616; "* * rights and liabilities of partners with respect to each other and to third persons are largely determined by agency principles,"

Restatement, Agency 2d, § 14A, p. 62; Iron v. Sauve, 27 Wash.2d 562, 179 P.2d 327, 331–332; and "certain legal consequences follow necessarily from the existence of partnership status. Each of the partners becomes the agent of the others and of the partnership in all matters connected with its business. Each partner is entitled to a voice in the management * * *." Schneider v. Schneider, 347 Mo. 102, 146 S.W.2d 584, 587 [2]. Harms and Kast operated their service station on a "50–50" basis, equal in authority and control. Under such circumstances and arrangement Harms was authorized to continue working on the Dodge away from the station, and it would be in the partnership interest for him to do so. At the time of the collision Velmar Harms was engaged in completing his partnership mission, i. e., the delivery of the Dodge to the partnership customer pursuant to the arrangement he had made with the customer. It was thus a trip he had to make that evening regardless of any personal motives involved in the trip to the hospital with the Wolfes. As a result, when Harms took the Dodge to drive the Wolfes to the hospital *and* to test its brakes and deliver it to its owner, he was, at the least, on a dual purpose mission, a part of which was within the scope and authority of his partnership with Kast. The dual purpose doctrine was recognized in connection with an employee's right to compensation for an injury occurring when traveling with concurrent business and personal motives in Corp v. Joplin Cement Co., Mo., 337 S.W. 2d 252, 255 [2]: "A much cited case expounding this doctrine is Marks' Dependents v. Gray, 251 N.Y. 90, 167 N.E. 181, 183, an opinion by Judge Cardozo. Briefly stated, the doctrine is that if the work of the employee creates the necessity for the travel, he is in the course of his employment, even though he at the same time is serving some purpose of his own." That case also cites Gingell v. Walters Contracting Corp., Mo.App., 303 S.W. 2d 683, which rejects distinctions in application of the doctrine based on whether

a trip had a business purpose as its primary purpose. "Some of the decisions have construed this doctrine to be applicable only when the *primary purpose* of the trip is on the employer's business, or sometimes referred to as the 'dominant purpose' test. Judge Cardozo used no such language. He said it was sufficient if the business motive was a *concurrent cause* of the trip. He then defined 'concurrent cause' by saying that it meant a cause which would have occasioned the making of the trip even if the private mission had been cancelled. As we understand this formula, it is not necessary that, on failure of the personal motive, the business trip would have been taken anyway *by this particular employee at this particular time*. It is enough that some one would have had to make the trip to carry out the business mission. If the trip would ultimately have had to be made, and if the employer got this necessary item of travel accomplished by combining it with the employee's personal trip, it would be a *concurrent cause* of the trip, rather than an incidental appendage or afterthought. There is no occasion to weigh the business and personal motive to determine which is *dominant*." 303 S.W.2d 1. c. 688 [3]. The doctrine is applicable here and the facts to which it is applied warranted submission of whether Harms was at the time of the collision operating within the scope of the partnership to the jury because, even if the predominant motive of the partner was to benefit himself or third persons, such does not prevent the concurrent business purpose from being within the scope of the partnership. Foster v. Campbell, 355 Mo. 349, 196 S.W.2d 147, 150 [4].

Appellants' citations do not deal with partnership relations but are concerned only with master and servant situations; and they bear additional obvious distinctions on their facts. In Dean v. Young, Mo., 396 S.W.2d 549, an appliance serviceman who came and went as he saw fit and received no directions on which service orders to fill from the store manager but looked

orders over and took those he chose was an "independent contractor" and not a "servant" of the store for respondeat superior purposes even though the manager sometimes told the repairman which customers to attend to first; in Stokes v. Four-States Broadcasters, Inc., Mo., 300 S.W.2d 426, plaintiff failed to show that defendant was exercising any control or had any right to control the physical movements of their alleged employee, Londo, at the time of the occurrence in question because the mission upon which Londo was then engaged was not any part of his job; Klotsch v. P. F. Collier & Son Corp., 349 Mo. 40, 159 S.W.2d 589, was also a case where plaintiff sought to hold an employer liable under principles of master and servant but at the time of the occurrence there was no right of control and, consequently, no submissible case; Hopkins v. J. I. Case Co., Mo., 293 S.W.2d 402, 407, involved an allegation of dual purpose but "the trip * * * was strictly personal * * * and was in nowise brought about or occasioned by the business of (the) employer. * * * The record admits of no other possible or reasonable inference"; in Wines v. Goodyear Tire & Rubber Co., Mo.App., 246 S.W.2d 525, the evidence was all that the employee was not on business for his employer because he had returned from a social use of his car and was on merely a trip to purchase gasoline for his next day's employment; in Miceli v. Williams, Mo.App., 293 S.W.2d 136, an employee took a vehicle owned by the service station where he worked to get sandwiches for his lunch, a trip not within the scope of his employment; in Usrey v. Dr. Pepper Bottling Co, Mo.App., 385 S.W.2d 335, the employee's wife driving her personal automobile, following employee while he was driving a delivery truck, was not employer's servant, and employer was not liable for the accident where, although employer originally made arrangements for employee's return, employee chose instead to have his wife pick him up for a family outing; and in Iron v. Sauve, supra, and Bunnell v. Vrooman, 250 Mass. 103, 145

N.E. 58, no partnership ownership, control, or business was involved, and the partnership was thus not liable.

Finally, all appellants contend that the court should have set aside the verdict in that the amounts were excessive and indicative of bias and prejudice and that, if not set aside, the verdict should be substantially reduced.

■ When a verdict is extremely excessive and cannot be supported by evidence and injuries sustained, the only reasonable hypothesis is prejudice or willful disregard of instructions. Gardner v. Stout, 342 Mo. 1206, 119 S.W.2d 790, 796 [10–12]; Grodsky v. Consolidated Bag Co., 324 Mo. 1067, 26 S.W.2d 618, 624; Ulrich v. Kiefer, Mo.App., 90 S.W.2d 140, 144. However, the assessment of damages is peculiarly a function of the jury and a verdict should not be interfered with absent an exercise of extreme caution because an appellate court does not "pass on the weight of the evidence in a jury case and that is the reason an appellate court will not make a determination of bias and prejudice of the jury on amount of the verdict alone." Nussbaum v. Kansas City Stockyards Co. of Maine, Mo., 359 S.W.2d 335, 341 [6]. "Each case must be considered upon its particular facts. Consideration is given to the nature and extent of the injuries and disabilities, diminished earning capacity, changing economic factors and the compensation awarded and approved in cases of similar or fairly comparable injuries." Rodefield v. St. Louis Public Service Co., Mo., 275 S.W.2d 256, 262 [11]. "Due regard should be given to the purchasing power of the dollar, to the rule of reasonable uniformity of awards for similar injuries and to the fact that the jury and the trial judge were in a better position than this court to measure an award of reasonable compensation, as well as to the fact that the trial court has approved the verdict in question." Hunter v. St. Louis Southwestern Ry. Co., Mo., 315 S.W.2d 689, 697 [10].

When measured by these criteria, it does not appear that the awards to Earl and Almeda Wolfe are products of jury misconduct or that they are excessive and suggestive of remittitur, and a review of plaintiffs' injuries shows that it is unnecessary to distinguish the many cases involving remittitur cited by appellants.

Almeda Wolfe sustained a cerebral concussion, fracture of the cervical spine, crushing of the left side of the upper portion of her body, fracture of nine ribs on the left side, partial evulsion of her left arm, punctured and collapsed lung, requiring tube drains for eight days, and multiple fractures of her pelvis involving her right leg. She underwent chest surgery for wiring of the ribs, remolding the chest, and removal of a blood clot, fibrin, and rib fragments from the chest, and a second operation for fusion and wiring of her upper spine by bone graft with material taken from her plevis. She was hospitalized for two months and one week, almost one month in complete immobilization, and medical bills exceeding $6,000 were incurred in her behalf. Although characterized by doctors as having made a remarkable recovery ("she was alive"), appellants admit that she sustained serious injuries as a result of the collision. Evidence shows permanent loss of motion in her upper three cervical vertebrae, loss of motion in left shoulder and arm amounting to 70 per cent in the aggregate, 30 per cent loss of chest use and difficulty in sneezing, breathing, and coughing, increased susceptibility to respiratory trouble, five to six per cent loss of pelvis motion, 40 per cent restriction in head motion, irregularity in walking including everted toes and a waddle, shortening, numbness, and atrophy of left arm and contracted shoulder girdle, slowing of mental processes, constant pain and numbness, permanent loss of ability to do normal housework and child care. She was 39 years old and had a life expectancy of 32.5 years. Her disability was placed at 15 and 20 per cent of the body as a whole, March 23, 1964, and at a higher total at trial, April 20, 1965.

Earl Wolfe received injuries to his left shoulder, left knee, ribs, neck, sprain of his back and right lower chest, cut nose, laceration of his left ear and punctured eardrum. He has resultant loss of hearing, dizziness, and discomfort. He incurred medical bills in addition to those contracted for his wife of $479.85 and lost wages of $480 to $640. He has a diminished ability to do work; he was hospitalized one day; and the award to this plaintiff of $13,500, less his special damages, leaves approximately $6,000 for injuries, pain and suffering, loss of services, and loss of ability to work.

Mrs. Wolfe's injuries are of a gravity comparable to those in Mantz v. Southwest Freight Lines, Inc., Mo., 377 S.W.2d 414, where an award of $250,000, including $41,590 special damages, for a 44-year-old race driver with better than average income who sustained permanently disabling injuries, including amputation of left arm above the elbow and multiple fractures of the right foot, femur and hip resulting in limitation of motion, was affirmed upon remittitur of $50,000. Here, Mrs. Wolfe's injuries occasioned over $6,000 in medical expense; her arm, although not amputated, was evulsed with resultant loss of use; she had fractures in her ribs and back; she has weakened mental processes; and her injuries are permanent. She has never been employed outside her home and was thus not awarded any damages for loss of time. An award of $82,106 was affirmed for similar injuries to a 47-year-old man who received a brain concussion, partial collapse of the right lung, four pelvic fractures, fracture of the first vertebra and of the tibia and fibula of the left leg resulting in loss of motion and limp, fracture of the left arm and resultant loss of use. He, like Mantz, had a loss of income which accounted to some extent for his award. Nussbaum v. Kansas City Stockyards Co. of Maine, supra. And the $6,000 for injuries,

loss of time, and personal medical expense to Earl Wolfe is similar to Siemes v. Englehart, Mo.App., 346 S.W.2d 560, where plaintiff was awarded $7,000 for comparable injuries and medical expense of $484, and this, without mention of loss of services. Medical bills incurred for Mrs. Wolfe, easily account for the balance of $13,500 awarded to Mr. Wolfe.

 By their failure to appeal plaintiffs conceded the propriety of ordering a retrial on the issue of liability as to defendants Harms and Kast. Those appellants contend, though, that the retrial ordered is insufficient relief when they complain also of excessive damages, Yarrington v. Lininger, Mo., 327 S.W.2d 104; Rosenkoetter v. Fleer, Mo., 155 S.W.2d 157. That contention passed out of this case, however, with the determination that the verdict was not excessive; and, under the circumstances of this case, the trial court properly ordered that portion of the verdict in favor of plaintiffs and against defendants Mehls and Southwest Freight Lines, Inc., against whom no error was committed, held in abeyance until the cause was finally disposed of as to the liability only of Harms and Kast, and then to enter judgment for the amount of the verdict in abeyance against all defendants finally held liable. Hoelzel v. Chicago, R. I. & P. R. Co., 337 Mo. 61, 85 S.W.2d 126, 134 [17]; Lemonds v. Holmes, Mo., 229 S.W.2d 691, 694 [8].

Accordingly, the action of the trial court, directing a retrial of the issue of liability as to defendants Harms and Kast and holding the verdict in abeyance as to defendants Mehls and Southwest Freight Lines, Inc., pending that retrial, is affirmed.

HOUSER and WELBORN, CC., concur

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.