Rose Mary POWELL, a minor, by her next friend, William Powell, and William Powell, Plaintiffs-Appellants,

v.

Clarence Harold WATSON, Administrator of the Estate of Dennis Ray Watson, Deceased, Defendant-Respondent.

No. 9718.

Missouri Court of Appeals, Springfield District.

July 1, 1975.

Rehearing Denied July 28, 1975.

L. Thomas Elliston, Webb City, Myers, Webster & Perry, Webb City, for plaintiffs-appellants.

Malcolm L. Robertson, Ronald E. Mitchell, Joplin, for defendant-respondent; Blanchard, Van Fleet, Martin, Robertson & Dermott, Joplin, of counsel.

Before BILLINGS, C. J., and STONE and TITUS, JJ.

TITUS, Judge.

Damage suit plaintiffs (successful with the jury) appeal from the court nisi's order granting defendant a new trial.[1] § 512.020 RSMo 1969, V.A.M.S. The court's reason for the order was that "there was not sufficient evidence to justify a submission . . on excessive speed and failure to keep a lookout," the only charged negligent acts submitted by plaintiffs. Defendant is administrator of the estate of Dennis Ray Watson who expired as a result of the subject casualty. Plaintiff Rose Mary Powell was said to be the sole passenger in the station wagon allegedly driven by decedent; her father, plaintiff William Powell, sought to recover medical expenses incurred on behalf of his minor daughter. The "dead man's statute" (§ 491.010 RSMo 1969) muted plaintiffs as testifying witnesses to the facts of the accident.

The casualty occurred west of Joplin on Christmas Eve 1971 near 7:20 p. m. at the intersection of east-west U. S. Highway 66 and north-south Black Cat Road. Both thoroughfares provide two traffic lanes paved with asphalt. The traveled portion of Black Cat Road is 25 feet wide; that of U. S. 66, described as a "through highway", is 24 feet wide. Asphaltic paved berms, 8 feet in width, adjoin the north and south sides of U. S. 66. Traffic at the intersection is controlled by stationary stop signs located north and south of U. S. 66, intended for observance by traffic traveling on Black Cat Road. The south stop sign is situate 30 feet south of the south edge of the traveled portion of U. S. 66. Both roads are straight and level at the intersection which, in daylight, can be seen from the east and west on U. S. 66 for a distance of ½ to ¾ mile. The accident happened on a moonless, starless night on dry pavement. No artificial lighting illuminated the intersection, described as "dark" save for lights of traveling vehicles. The lawful speed limits at the time were 65 m. p. h. on U. S. 66 and 60 m. p. h. on Black Cat Road. § 304.010, subd. 2(3), (4) RSMo 1969. At the north and south sides of the intersection the pavement on Black Cat Road is fan-shaped, thereby making the pavement on that roadway somewhat wider than its normal width of 25 feet as it abuts onto U. S. 66.

Generally, the consensus was that the station wagon, occupied by decedent and plaintiff Rose Mary Powell, was westbound on U. S. 66 when an unidentified pickup-camper type of vehicle was approaching the intersection from the south on Black Cat Road. The camper stopped at the south edge of U. S. 66 to permit an eastbound automobile occupied by the Phillips family safe passage through the intersection. Immediately after the Phillips vehicle cleared the intersection, the camper "whipped out" or "came out fast" into the intersection ahead of the station wagon, turned left or

---

[1]. Defendant also appealed from the trial court's denial of his motion for judgment in accordance with his motion for directed verdict. We, sua sponte, dismissed that appeal as being unauthorized by § 512.020 RSMo 1969. *Powell v. Watson,* 516 S.W.2d 51 (Mo.App.1974).

west partly upon the north shoulder and north traffic lane of U. S. 66 blocking both. In an apparent effort to avoid colliding with the camper, the brakes of the station wagon were applied, recording tire marks which commenced on the traveled portion of U. S. 66 east of the intersection, continued westward onto the north shoulder of U. S. 66, across the north "throat" of the intersection, and ended where the station wagon left the pavement before plummeting into "a rather deep ditch" at the northwest corner of the intersection. The station wagon came to rest on its top headed east. The camper continued westward on U. S. 66 and neither it nor its driver was ever found.

 Before recasting the evidence particulars: as observed in *Powell v. Watson,* supra, 516 S.W.2d at 52, n. 1, although the trial court granted defendant's after-trial motion for a new trial, defendant is entitled now (as he has done) to raise the more basic issue that the court should have sustained his alternative motion for judgment in accordance with his motion for a directed verdict. We shall consider this first, for if the plaintiffs did not make a submissible case, the issue of the correctness vel non of the trial court's grant of a new trial is immaterial. In measuring the submissibility of plaintiffs' case we review the evidence on the two alternative or disjunctive submissions of lookout and excessive speed upon which plaintiffs grounded their recovery [*Begley v. Connor,* 361 S.W.2d 836, 839[4] (Mo.1962)], and consider the evidence in the light most favorable to plaintiffs, disregarding ·opposing evidence except where it aids plaintiffs' position. *Kinder v. Pursley,* 488 S.W.2d 937, 939, 940[2, 3] (Mo. App.1972).

*Billy Gene Phillips,* accompanied by his wife (Evelyn) and children, was driving "roughly" 50 m. p. h. east on U. S. 66. He said the length of a car is 17 or 18 feet. One block west of the intersection Phillips observed the pickup-camper a block south traveling north on Black Cat Road at an unknown speed but at such a rate as to make him apprehensive it might not stop before entering the intersection.[2] As the speed of the Phillips car was slowed, so too was the speed of the camper before it came to a stop near the south edge of U. S. 66. Seeing that the camper was stopping, Phillips increased his speed to 35 or 45 m. p. h. and proceeded to and through the intersection while the camper waited. "Q. . ., did you ever observe that pickup again? A. Just in my rearview mirror. Q. How far had you traveled past the intersection when you next observed the pickup? A. Just as I got by. Q. Can you tell me in car lengths how far past you were? A. Maybe one or two, somewhere along there. Q. All right, at the time you glanced up in your rearview mirror and saw the pickup, did you observe anything else? A. I seen the pickup swerve over on the highway, over on the shoulder, and the taillights of a car. . . . Q. What were they doing at the time? A. They were going up. . . . I could conclude that he was hitting the ditch. Q. . . . how far west of the middle of the intersection of Black Cat and [U.S. 66] was the camper . . . when you saw the taillights of the car go up in the air? A. . . . I'd say around two, two to three car lengths. . . . Q. You saw the taillights go across [the intersection]? A. Just before they hit the ditch. . . . Q. And at that time the back end of the car and the pickup would have been about 2 or 3 car lengths from each other? A. I'd say somewhere along there. . . . Q. —during all that time the pickup was proceeding west? A. Well, he either stopped after he got on the shoulder or slowed down real slow. . . . Q. And half the pickup was on the shoulder? A. Yes, sir. Q. And half of it was still in the westbound lane? A. Yes, sir. . . . Q.

2. No witness testified to the length of a block, but it is common knowledge that a block is approximately 300 feet long. *Lilly v. Boswell,* 362 Mo. 444, 452–453, 242 S.W.2d 73, 76[4] (1951); *Mullen v. Mc-Donald,* 494 S.W.2d 694, 695, n. 1 (Mo.App. 1973).

Well, if the automobile had been continuing in the westbound lane, straight through the intersection west, would it not have been on a collision course with the camper? A. Yes, sir, to my knowledge, I mean the way it looked to me it would have been. . . Q. Do you recall the automobile that ended up in the ditch, actually going by you? A. No, sir."

*Evelyn Phillips,* passenger in the automobile being driven east on U. S. 66 by her husband, estimated the car's speed at 50–60 m. p. h. as they were nearing the intersection. It was dark; the traffic was "medium." She saw the pickup-camper traveling north on Black Cat Road when it was one-half to one block south of the intersection. The camper's speed was unknown to Mrs. Phillips except "it didn't act like it was going to stop." Her husband slowed the car's speed to 30–40 m. p. h. and "when he seen [the camper] was going to stop" and stop, "then he increased his speed up to 45, 50 miles per hour." After the camper had stopped, "you had to drive 50 or 60 feet before you got up to the intersection . .? A. Yes. Q. And [the camper] waited all that while? A. Yes. . . . Q. Then he went safely through? A. Yes, he did. . . . Q. Now, after you passed through the intersection, you noticed the headlight of a westbound car . . .? A. Yes. Q. And that car went past you? A. Yes, it did. Q. And immediately after it passed you, your husband said some drunk pulled out in front of that car, didn't he? A. He said something like that. . . . Q. And you saw the headlights of the westbound car just before your husband made that statement? A. Yes, sir. Q. And at the time your husband made that statement . . . your car was perhaps four car lengths east of the intersection? A. Yes. Q. And you had observed the headlights of that car coming toward you, perhaps it was also four or five car lengths from the intersection? A. Yes. . . . Q. Now, when your husband made that statement, you turned around . . . and you looked? A. Yes. Q. But the accident had already happened, had it not? A. Yes. . . . Q. The car had come to a rest? A. Yes. Q. And was already up in the ditch? A. Yes. Q. And then it was after you saw the car stopped up in the ditch that you noticed this pickup camper? A. Yes." The camper, according to Mrs. Phillips, was then "along the shoulder of the road, headed west [and] if he was moving, he was moving slow . . . part of it blocking the shoulder and part of it blocking the west[bound] lane." Whether any traffic was following the Phillips vehicle, Mrs. Phillips did not know.

*Patricia Ann Neeley* was a passenger in a Ford being driven east on U. S. 66 by her husband. The Ford was following "probably" 3 or 4 car lengths behind another unidentified eastbound vehicle. Both vehicles were going at the same rate of speed but Mrs. Neeley did not state what that speed was. When the Ford was "a block or so" west of the intersection, she espied a camper headed north on Black Cat Road "about a block or something in that area" south of the intersection. The camper was moving at "what I considered a rather fast rate of speed . . . I thought he was driving too fast to stop" at the stop sign, and Mrs. Neeley so commented to her husband. However, the husband did not slow the speed of the Ford as "I recall." Mrs. Neeley did not continue to observe the camper's progress and did not know whether or not it stopped at the stop sign. When the Ford was still about a half block west of the intersection, Mrs. Neeley saw "the taillights of a car going over in the northwest corner of the intersection." The Ford was stopped on the south shoulder of U. S. 66 near the intersection, and as Mr. and Mrs. Neeley were getting out of the cars, she saw the camper for the second time about one half block from the intersection traveling west in the westbound traffic lane. Having not seen the automobile until it "was already turning over" in the ditch, this witness did not know where it was when the camper entered the intersection.

*Merle Graham* investigated the accident on behalf of the Missouri State Highway Patrol. He testified as to the location of the stop signs, and related his measurements of the widths of the roadways and the shoulders on U. S. 66. We have recounted that data, supra, and will not repeat. Upon his arrival at the scene, Trooper Graham found the station wagon "on its top in the northwest ditch . . . laying slightly on its left side on the roof" headed "almost directly back east." It was approximately 64 feet west of the west edge of Black Cat Road and approximately 27 feet north of the north edge of U. S. 66. The trooper discovered skidmarks; the right tires on the station wagon started skidding 173 feet east of the west edge of Black Cat Road or 148 feet east of the east edge of Black Cat Road. From the start of the skidmarks, which was in the north traffic lane of U. S. 66, they continued on the pavement a distance of about 88 feet, then went onto the north paved shoulder of U. S. 66 for a distance of 60 feet, and thence westward 25 feet across Black Cat Road. As agreed by the trooper, "the [right] skidmark first went to the shoulder at a point just east of where the blacktop approaching the intersection [from the north] widens out onto the shoulder [at] [w]hat you might call the throat of the intersection." A left skidmark was also made by the station wagon; it was approximately half as long as the right skidmark or "80 some feet" long. Trooper Graham further testified to the following: A car traveling 60 m. p. h. on dry, level concrete "takes close to 300 feet to stop [including] reaction time and stopping distance [and] could leave skidmarks in excess of 200 feet"; a car traveling 60 m. p. h. goes 88 feet a second; at 65 m. p. h. a car travels 95 feet per second; at 55 m. p. h. it would travel 80.7 feet per second. The ditch at the northwest corner of the intersection, previously described as "a rather deep ditch," was "actually a culvert going underneath the road [and] that ditch runs parallel with Black Cat and then it also turns and goes up west parallel with

66." Trooper Graham said he was not qualified "to tell how fast a car was traveling from skidmarks."

No evidence was adduced concerning the speed or estimated speed of the westbound station wagon at any time or at any place. Likewise, no one located the position of the station wagon on U. S. 66 while the camper was approaching, slowing, stopping or remained standing at the south edge of the intersection. Although the intersection was visible for ½ to ¾ mile east and west thereof in daylight, what the visibility may have been in the dark with only headlight aid was never shown. Witnesses who observed the camper approaching from the south, saw it do so from west of the intersection; whether its full approach from a block south of the intersection could have been seen by the operator of the station wagon at its then unknown location east of the intersection, is left to conjecture. Mr. and Mrs. Phillips additionally testified that when their car was about ½ block west of the intersection and slowing, the camper too was slowing, and that it had slowed considerably upon nearing the stop sign before it came to a complete stop at the south edge of U. S. 66. Upon realization that the camper was stopping, the speed of the Phillips car was increased to 35 or 50 m. p. h. (51.4 or 73.35 feet per second) and driven 2 to 4 car lengths (34 to 72 feet or .475 to 1.36 seconds) to the intersection and 25 feet (.34 to .486 seconds) across Black Cat Road before clearing the intersection. Therefore, whatever threat of danger may have been gleaned from the camper's apparent fast approach to the intersection one block south of U. S. 66, diminished as it neared the intersection, vanished when it was stopping and stopped, and remained in repose for .815 to 1.846 seconds while the Phillips car came onto and cleared the intersection. The location and speed of the station wagon during this period is not known.

## LOOKOUT

If, as all have done, it be assumed the sighted headlights and taillights and the

skidmarks found by the trooper all belonged to the station wagon, the fallibility and frailty of plaintiffs' reliance upon the testimony of Mr. and Mrs. Phillips (the only witnesses purporting to see both the camper and station wagon prior to the casualty) becomes evident when exposed to the skidmark measurements, known facts regarding rates of speed, and the assumption by courts (sans contrary evidence) that human reaction consumes the relatively rapid time of $\frac{3}{4}$ second. *Shelton v. Bruner,* 449 S.W.2d 673, 677, note 4 (Mo.App.1969). Mr. Phillips recounted that when his car was 1 or 2 car lengths (17 to 36 feet) east of the intersection traveling 35 to 45 m. p. h. (which, at the most, would be $\frac{68}{100}$ second past the intersection) he saw the camper "whip out," "gun out" or come "out fast" into the intersection and immediately thereafter, in the same or second glance in his rearview mirror, also saw taillights at the west edge of the intersection "[j]ust before they hit the ditch." Acceptance of this would indicate that the camper entered the intersection in less time than its driver's reaction time would allow after the Phillips car cleared the intersection, and that the station wagon had arrived at the intersection coincidentally (or nearly so) with the camper's entry therein and before the driver of the station wagon could react to cope with the camper's sudden presence in the intersection. Mrs. Phillips placed the speed of the Phillips car at 45 to 50 m. p. h. (66 to 73.35 feet per second) when she saw westbound headlights which met and passed the Phillips car before it was 4 car lengths (68 to 72 feet or less than 1.06 seconds) east of the intersection and just before her husband announced his observation that the camper had pulled "out in front of that car." This testimony would also put the station wagon very near to or at the intersection as the camper gunned out and then stopped or was moving "real slow" to block the safe passage of the station wagon either on the highway or north shoulder. However, the tire marks attributed to the station wagon attest that the driver of that vehicle saw and appreciated some danger $\frac{3}{4}$ second before the tire marks commenced 148 feet east of the intersection and before the conglomerate testimony of Mr. and Mrs. Phillips moved the camper from its stopped position south of U. S. 66 into the intersection and the path of the station wagon.

■ Albeit a stop sign does not relieve a motorist on a through highway of the duty to maintain a careful lookout ahead and laterally, nor permit him, irrespective of the circumstances, to drive blindly into the intersection, nevertheless such a motorist, absent circumstances that would put a reasonable person in the exercise of the highest degree of care on notice that it was not safe to do so, has the right to assume the driver of a nonemergency vehicle will obey the stop sign intended for his observance, will stop before entering the through highway [*Wolfe v. Harms,* 413 S.W.2d 204, 210[3] (Mo.1967); *Pitts v. Garner,* 321 S.W.2d 509, 518[11] (Mo.1959)], and once having stopped will yield the right-of-way to vehicles which are approaching so close on the through highway "as to constitute an immediate hazard during the time when such driver is moving across or within the intersection." § 304.351, subd. 4(1)(a) RSMo 1969.

■■ For plaintiffs to make a submissible case based on failure to keep a careful lookout, it was not necessary for them to produce direct evidence that decedent was not looking. *Dorrell v. Moore,* 504 S.W.2d 174, 178[4] (Mo.App.1973). However, before their case could become submissible, it was required that plaintiffs satisfy the burden of proving all facts and circumstances essential to submission of the negligence charged [*Williams v. Boone,* 413 S.W.2d 36, 40[2] (Mo.App.1967)] by producing substantial evidence from which the jury could have reasonably found that decedent, in the exercise of the highest degree of care, could have seen the danger sooner than he did [*Levin v. Caldwell,* 285 S.W.2d 655, 659[3] (Mo.1956)] and in time thereafter to have taken effective precautionary action. *Shelton v. Bruner,* supra, 449 S.W.2d at 679.

Possession of the ability and means to avoid a danger of collision means more than mechanical appliances, such as brakes, with which to slow or stop; it also includes the existence of sufficient time and distance to take effective action in avoidance. *Stegall v. Wilson,* 416 S.W.2d 658, 662[3] (Mo.App. 1967).

Until there was substantial evidence establishing negligence, it is presumed that decedent was using due care while driving westward on U. S. 66 [*Lindsay v. Wille,* 348 S.W.2d 1, 4[3] (Mo.1961)], and that he was, inter alia, maintaining a careful lookout ahead and laterally. *Michaud v. Burlingame,* 490 S.W.2d 680, 684 (Mo.App.1973). If it be assumed that decedent in the exercise of the highest degree of care could and should have seen the camper one block or more south of the intersection, without knowing the speed or location of the station wagon at that time, no one, short of guessing, could say that the camper's then rapid approach, even if it appeared the camper might not stop in observance of the stop sign, presented any danger to the station wagon requiring precautionary action by decedent. Of course, when the speed of the camper was materially reduced as it neared the intersection and when the camper was stopped at the south edge of U. S. 66, this would have put an end to whatever danger, if any, the camper's prior approach may have presented. Thereafter, decedent's duty to take effective precautionary action would not arise until, in the exercise of due care, he could and should have seen and realized that it was likely to proceed into his path from its stopped position. *McAlister v. Urhahn,* 492 S.W.2d 19, 21[4] (Mo.App.1973). To tolerate another assumption and suppose decedent, from wherever the station wagon may have been at that time, could and should have seen the camper halted at the south edge of U. S. 66, the record suggests no evidence of any movement by the camper or conduct of its driver which would work to destroy decedent's right to assume that the camper's operator would not continue to yield the right-of-way to all vehicles approaching so close on U. S. 66 as would constitute an immediate hazard. After the camper came to a halt south of the intersection, the only evidence of movement on its part which would impose a duty on decedent to undertake effective precautionary action occurred when he could and should have seen the camper "whip out," "gun out", or come "out fast" onto U. S. 66. At that time the speed of the station wagon is unknown; at that time its location relative to the intersection is also unknown unless it can be calculated from the recastings of Mr. and Mrs. Phillips or from the skidmarks measured by the trooper. The Phillips' testimony put the camper into the intersection and in the path of the station wagon less than or no more than a second before the station wagon arrived at or in the intersection. Considering the time necessary for decedent to react to the danger of collision, the testimony of Mr. and Mrs. Phillips would raise in decedent the duty to take evasive action only when the near collision was already occurring. *Wardenburg v. White,* 518 S.W.2d 152, 154–155[4] (Mo.App.1974). On the other hand, the skidmarks indicated decedent had undertaken precautionary action at least ¾ second before the station wagon was 148 feet east of the intersection or before the camper drove onto U. S. 66 according to Mr. and Mrs. Phillips. Thus, where the station wagon was *actually* positioned when the camper's movement produced a situation of danger, can be reckoned only through speculation and conjecture. We find no substantial evidence to justify an inference that decedent failed to keep a lookout or that he could and should have seen and appreciated the danger of collision sooner than he did. The evidence, in fact, is to the contrary. Had decedent failed to keep a lookout, the station wagon probably would have collided with the camper; had he turned to the left or south, he probably would have hit the Phillips car or been confronted with eastbound traffic at and approaching the intersection. The record justifies the inference that decedent fully

realized his precarious position and undertook the only way of possible escape. *McDowell v. Mohn,* 426 S.W.2d 95 (Mo. 1968). In short, we are of the opinion that there was no substantial evidence to support a finding that decedent, in the exercise of the highest degree of care, could or should have seen a situation of peril at the intersection sooner than he did.

## SPEED

Excessive speed depends upon the circumstances existing at the time and place of the incident (*Dorrell v. Moore,* supra, 504 S.W.2d at 179[9]), and driving at a speed which endangers persons and property under then existing conditions may constitute negligence even though that rate of speed is within the limits of a statute. *Rakestraw v. Norris,* 478 S.W.2d 409, 415[9] (Mo.App.1972). It is not required that excessive speed be shown by direct testimony; it may be proved by circumstances. *Russell v. Kotsch,* 336 S.W.2d 405, 409 (Mo.1960). Nonetheless, negligence must be proved; it cannot be assumed or shown by piling one inference on another. *Joplin v. Franz,* 240 S.W.2d 209, 210–211[2, 3] (Mo.App.1951). Excessive speed is not the proximate cause unless it prevents the driver from avoiding the accident, or, stated otherwise, it must be shown that the accident would not have occurred except for the excessive speed shown by the evidence. *Marshall v. Bobbitt,* 482 S.W.2d 439, 442[1] (Mo.1972); *Miller v. Fink,* 387 S.W.2d 173, 176[2] (Mo.App. 1965). Causal connection must be proved by the evidence as a fact and not be left to mere speculation and conjecture. However, this does not require direct proof of the fact itself; it is sufficient if the facts proved are of such a nature and are so connected and related one to another, that the conclusion therefrom may be fairly inferred. *Watt v. St. Louis Public Service Company,* 354 S.W.2d 889, 891[2] (Mo.1962).

Plaintiffs cede there was no testimony by a witness as to the speed of the station wagon at any given time. Nevertheless, they argue "the evidence of skid marks, impact, force of impact, the flipping over of the vehicle, the distance traveled by the vehicle in the space of time that a witness [Mrs. Phillips] could turn her head from front to rear, that [decedent] was thoroughly familiar with the area and the intersection, that the pickup-camper approached the intersection at a high rate of speed traveling past the stop sign and stopping at or within three feet of the traveled portion of the highway, that the pickup-camper appeared as if it was not going to stop, and other relevant factors and evidence was sufficient evidence to justify a submission to the jury on the issue of excessive speed." We disagree.

A submissible case cannot be made against a driver of an automobile by proof that it merely skidded into a collision on the highway. *Friederich v. Chamberlain,* 458 S.W.2d 360, 366[4] (Mo. banc 1970). No one undertook to estimate from the skidmarks, or from any other evidence in this case, the speed at which the station wagon may have been traveling at any time. Such an undertaking would have been highly speculative here because the station wagon did not end its skid by reason of its own braking power; it ended it by dropping into "a rather deep ditch" and upsetting in some unknown manner either before or after colliding with an embankment at some unstated distance from the intersection. It is worthy of note that the only evidence of stopping distance at any speed came from the testimony of Trooper Graham. He said a car traveling 60 m. p. h. (well within the statutory speed limit then in force for traffic on U. S. 66) would require, including reaction time, "close to 300 feet to stop [and] could leave skid marks in excess of 200 feet." We have evidence that the right tires on the station wagon started skidding 173 feet east of the west edge of Black Cat Road or 148 feet east of the east edge of that roadway and that a left skidmark was also made approximately half as long as the right mark or "80 some feet." What inference can be drawn from that? Did decedent apply the brakes

on the station wagon because he was driving too fast? Or was it because, driving at a normal speed which was not excessive under the circumstances, he saw the camper approaching the intersection and was merely trying to reduce his speed? Or, driving at a normal and safe speed, did he apply the brakes because he saw the camper "gun out" into the intersection from its previously stopped position? Or what? "'You pay your money and take your choice,' and everyone is entitled to his own guess; but we cannot permit a man to be guessed into liability." *Greenwood v. Vanarsdall,* 356 S.W.2d 109, 112 (Mo.App.1962). There is no "requirement that every person who operates an automobile on a through highway in a rural area must operate it so that in every case he can in some manner avoid any automobile which is unlawfully and deliberately driven onto the highway from a side road directly and immediately in front of him." *Pitts v. Garner,* supra, 321 S.W.2d at 519.

Trooper Graham testified that "apparently the door [on the driver's side of the station wagon] had came open on impact and [decedent's] head and neck to his shoulders had went . . . between the door post on the windshield and the door post itself . . . and his head had came between that and when the car rolled, it came back shut. In other words, it had closed on his neck." He also stated that because the station wagon was on its top and partially rolled onto its left side, it was necessary to obtain the services of a wrecker "to hook onto the car to pull it back up on its right side to get the door open to dislodge the body from the car." When asked if it was necessary to pry the door open "with crowbars and stuff" or if it could be opened "with the door handle," the patrolman answered: "Truthfully I couldn't answer that, sir, I don't actually remember." No pictures of the station wagon were offered in evidence and no witness undertook to describe the nature and extent of damage sustained by that vehicle as a result of its running into and upsetting in the ditch.

The mere happening of an accident does not establish negligence on the part of a motorist. *Harris v. Lane,* 379 S.W.2d 635, 638[6] (Mo.App.1964). Thus, the mere fact there was an impact of the station wagon with an embankment in the ditch, or the fact of the vehicle "flipping over" in the ditch, did not constitute substantial evidence of any negligence on the part of the decedent or alone serve to prove the station wagon was being driven at an excessive speed. We have already echoed that excessive speed may be proved by circumstantial evidence; we add recognition that while neither skidding nor the heavy destructive effect of an impact is in itself proof of negligently high speed, either, when taken together with all other circumstance, may indicate excessive speed. *Rakestraw v. Norris,* supra, 478 S.W.2d at 416[11]. In the instant case there was no pictorial evidence nor verbal description of the damage inflicted to the station wagon save what was said by Trooper Graham, supra. Ergo, whether or not the station wagon was heavily damaged in the accident, which considered together with other circumstances would justify a reasonable inference of excessive speed, would be an apparition a jury could come by only through visionary prowess dehors the record.

Plaintiffs' argument that the speed of the station wagon could be considered excessive because the distance it traveled "in the space of time that a witness could turn her head from front to rear," is based on the assumption that the station wagon traveled at least 68 feet to the intersection, plus 25 feet across Black Cat Road and another 64 feet from the west edge of Black Cat Road where it came to rest in the ditch, or a total of 157 feet "in the brief time it took Evelyn Phillips to turn her head." However, the records show Mrs. Phillips agreed that it was *after* the station wagon met and passed the Phillips vehicle her husband remarked concerning the camper and that the statement was made when their car "was perhaps four car lengths east of the intersec-

tion." Therefore, by Mrs. Phillips' account the station wagon was at some unspecified distance, but less than 68 feet from the intersection when the two vehicles met and passed. Furthermore, plaintiffs' calculations do not account for the unknown time required for Mr. Phillips to make his observation and to utter his statement, nor the reaction time required for Mrs. Phillips to respond to her husband's remark. An attempt to compute rates of speed from fragments laced with unknowns is a haphazard try at a precarious solution which is pervaded with substantial doubt.

■ Decedent's familiarity with the intersection and the testimony of witnesses that when the camper was a block south of the intersection they felt it was not going to stop, do not tend to prove the speed of the station wagon at anytime nor offer substantial evidence from which the station wagon's speed could be reasonably inferred. Such factors might relate to an awareness of possible danger at the intersection or show excessive speed in light of all the circumstances, but a showing of excessive speed presupposes that the speed has been established which these factors do not tend to do.

Plaintiffs contend that excessive speed of a vehicle may be shown by piecing together various known factors as was done in *Marshall v. Bobbitt,* supra, 482 S.W.2d at 443. We do not disagree, but point out the factors shown in *Marshall* are not known here. E. g., in *Marshall* defendant said his speed was 60–65 m. p. h.; from 65–85 m. p. h. according to other witnesses. The speed of the station wagon was unknown on the occasions with which we are concerned. The defendant in *Marshall* could and should have seen the pickup driven onto the highway from a side road when defendant was 375 feet from the intersection; the position of decedent in this case at the time the camper gunned out into the intersection was not shown with any degree of certainty. Also present in Marshall, among other facts for the jury to consider in determining excessive speed or not, were defendant's speed at point of collision, violence of the impact, the speed of both vehicles after the momentum-absorbing impact, and the length of skidmarks of both vehicles from point of collision to where they came to rest. None of these items were present in the instant case.

It would require too much space to discuss all of the cases cited by plaintiffs. We do not disagree with them but observe that all but *Wehrkamp v. Watkins Motor Lines, Inc.,* 436 S.W.2d 698 (Mo.1969) and *Hausherr v. Kansas City Public Service Co.,* 268 S.W.2d 433 (Mo.App.1954), had some semblance of direct testimony of the speed of the involved vehicles. In *Wehrkamp* there were known distances from which the jury could reason backwards and find the vehicle entering the highway could have been seen doing so by the other driver when he was 650 feet from the crossover. Also present in that case was evidence of the tremendous damage to both vehicles, skidmarks after impact, etc. *Hausherr* presented evidence of the known location of defendant's streetcar from the intersection when the automobile entered, the fact the streetcar traveled in excess of 200 feet while the automobile was being driven 28 feet, the uncontradicted finding that the streetcar carried the automobile 80 feet before it became disengaged and did not stop until it (the streetcar) was 113 feet beyond the point of collision.

Out of the welter of vague and irreconcilable testimony of the witnesses, the failure of any factor shown by their testimony, either singly or collectively, to permit a reasonable calculation of the speed of the station wagon at any given time or place, and the lack of any showing that the unknown speed of the station wagon was such that the accident would not have occurred had the rate been slower, we conclude that liability in this case based on alleged excessive speed could only be found in speculation, guesswork and conjecture. Cf. *Probst v. Seyer,* 353 S.W.2d 798 (Mo.1962).

■ Whether negligence can or cannot be inferred from given facts is a question of

law. Determination of whether evidence is substantial, as a matter of law, and warrants inferences sufficient to submit it to the jury is a judicial function. "When evidence is such that, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by nonsuit, directed verdict or otherwise in accordance with applicable practice without submission to jury, or by judgment notwithstanding the verdict. . . . That means that where facts in evidence and legitimate inferences therefrom are so strongly against a verdict for plaintiff[s] as to leave no room for reasonable minds to differ, defendant is entitled to a directed verdict." *Tharp v. Monsees,* 327 S.W.2d 889, 899[12, 13] (Mo. banc 1959).

For the reasons heretofore given, the judgment is reversed and the cause remanded to the circuit court from whence it came with directions to enter judgment for defendant.

All concur.